IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DEBBIE K. "DEB" GRUVER,

    *Plaintiff*,

vs.

    Case No.

CHIEF GIDEON CODY,
MARION, KANSAS POLICE DEPARTMENT,
in his individual capacity,

    *Defendant*.

## COMPLAINT

COMES NOW the plaintiff, DEBBIE K. "DEB" GRUVER, through her undersigned counsel of record, and in support of her claims against the defendant, CHIEF GIDEON CODY, MARION, KANSAS POLICE DEPARTMENT, in his individual capacity, hereby states and alleges as follows:

### INTRODUCTION

1.    This action arises from a shocking, unprecedented and unconstitutional police raid in Marion, Kansas, a small Kansas town of approximately 1,900 citizens. Targeted in the Friday, August 11, 2023, raid were the offices and personnel of the local newspaper, the *Marion County Record.*

2.    Separately targeted by police during the August 11 raids were two other nearby homes: (1) the home of the paper's co-owner and publisher, Eric Meyer, and the paper's 98-year-old co-owner – Eric's mother, Joan Meyer; and (2) the home of the city's Vice-Mayor, Ruth Herbel. Joan Meyer died the following day at 2:53 p.m. of sudden cardiac arrest.

1

3. On August 11, Chief Gideon Cody of the Marion Police Department obtained and executed on three search warrants for a newspaper's offices and two private homes ostensibly because a previously identified *Record* reporter, Phyllis Zorn, had accessed a local citizen's driving records from a public website, culminating in the seizure of 18 items including computer towers, a server tower, personal cellular phones, laptops, a router and an external hard drive.

4. *Marion County Record* reporter Deb Gruver, whose personal cellular phone was snatched away by Chief Cody during the raid on the *Record's* offices, now seeks justice and accountability under 42 U.S.C. § 1983 for Chief Cody's malicious and recklessly indifferent violation of her rights under the First and Fourth Amendments of the United States Constitution.

## STATEMENT OF FACTS

Plaintiff hereby adopts by reference paragraphs one through four (1-4) inclusive, and, in addition, further states and alleges:

### *Lead-Up to the Raid*

5. Deb Gruver is an award-winning journalist who began working as a Staff Writer with the *Marion County Record* in 2022 under Eric Meyer, the paper's co-owner and publisher. The *Record* is a weekly newspaper with offices located directly across the street from the Marion County District Courthouse.

6. In August 2022, Ms. Gruver was new to town and sought out popular local establishments for review. She ended up dining at the Parlour 1886 restaurant inside the Historic Elgin Hotel and wrote a glowing review, complimenting chef Kari Newell's spatchcock chicken with whole new potatoes and asparagus, followed by the "Death by Chocolate" cake for dessert. Chef Newell "outdid herself," Gruver wrote.

2

7. On February 1, 2023, chef Newell took over ownership of the restaurant, changing the name to Chef's Plate at Parlour 1886. The restaurant remained within the Historic Elgin Hotel, which was owned and operated by Tammy Ensey along with her husband, Jeremy.

8. Ms. Gruver and Ms. Newell maintained a friendly relationship until late April 2023, around the time of Chief Cody's hiring, when the relationship broke down. Ms. Newell criticized Ms. Gruver's reporting and complained about her talking to "sources" while inside the restaurant – apparently after overhearing a telephone call.

9. "I'm not the one [to mess with]," Ms. Newell told Ms. Gruver in a contentious text exchange.

10. In June 2023, Ms. Newell opened a coffee shop, Kari's Kitchen, directly across the street from the Elgin Hotel.

11. By June 2023, Ms. Newell's two restaurants, the offices of the *Marion County Record* and the Marion Police Department were all located within blocks of each other near downtown Marion.

12. Meanwhile, on April 21, 2023, the *Record* confirmed that Gideon Cody had accepted a job offer from Marion Mayor David Mayfield to become the new Chief of the Marion Police Department. Chief Cody came to Marion after 24 years with the Kansas City, Missouri Police Department, where he had most recently served as a Captain.

13. In mid-to-late April 2023, around the time of Chief Cody's application for the job, the *Marion County Record* began investigating various allegations of misconduct against Cody, based on anonymous sources who had worked with Cody in Kansas City but declined to go on record with their claims.

14. The *Record* could not obtain Cody's personnel file from the KCMO police department to independently verify the allegations, so it did not publish the story at the time.

15. Cody, however, was aware of the *Record's* investigation into his prior misconduct.

16. Specifically, Cody was aware that Ms. Gruver was the one conducting the investigation, having discussed the investigation with her around the time of his hiring in April 2023.

17. On August 1, 2023, Kari's Kitchen hosted a public meet-and-greet event with United States Representative Jake LaTurner (R, 2nd Dist.), whose constituents as a congressman included the citizens of Marion.

18. Three of the five members of the Marion County Board of County Commissioners were present at the public event.

19. Mr. Meyer and a *Record* reporter, Phyllis Zorn, attended the event and were in line attempting to buy coffee when Chief Cody approached them and advised that Ms. Newell had asked them to leave.

20. Newell later confirmed to reporters that she had asked Meyer and his reporter, Zorn, to leave, because she believed the newspaper "has a long-standing reputation for twisting and contorting comments within our community."

21. Mr. Meyer wrote and published a story about Ms. Newell which was published on Wednesday, August 9, 2023.

22. The story, titled "Restaurateur accuses paper, councilwoman[1]" states that Ms. Newell appeared before the Marion City Council less than one week after ejecting *Record* reporters

---

[1] http://peabodykansas.com/direct/restaurateur_accuses_paper_councilwoman+5447newell+52657374617572617465 7572206163637573657365732070617065722c20636f756e63696c776f6d616e (accessed August 22, 2023).

from Congressman LaTurner's reception and accused the *Record* of illegally obtaining drunken-driving information about her and then providing it to a city council member, Vice-Mayor Herbel.

23.     The story further stated that the *Record* and Vice-Mayor Herbel had both separately received information from a confidential source indicating that Ms. Newell's license had been suspended in 2008 due to a drunken-driving conviction and other driving infractions.

24.     The story further stated that Ms. Newell had confirmed to the *Record* directly after the council meeting in a discussion she initiated that the information was accurate.

25.     The story further stated that the *Record* had separately verified the information was accurate and had been obtained from a public website but had nevertheless decided against publishing the story.

26.     In fact, *Record* reporter Phyllis Zorn had confirmed the accuracy of this information – which she had originally received from a local resident, Pam Magg, via a screenshot sent through Facebook – on the public Kansas Department of Revenue Driver's License Check website.

27.     After receiving the screenshot and seeking to independently verify the information, Ms. Zorn had reached out to the Department of Revenue to ask how to obtain the information, and they directed her to the same link she ultimately utilized.

28.     Kansas Department of Revenue spokesperson Zack Denney would later confirm to news outlets that the online search was legal. "The website is public-facing, and anyone can use it," he said.

29.     The federal Driver's Privacy Protection Act, 18 U.S.C. 2721 (b)(5), allows access to information about a person's driver's status for research activities, so long as the personal information is not published, redisclosed, or used to contact individuals. In this instance, the information was used to verify the confidential source's information and was not published.

30. Instead of publishing the story, the *Record* consulted with an attorney and notified Chief Cody and the Marion County Sheriff that the source had alleged local law enforcement was aware that Ms. Newell did not have a valid driver's license and had ignored repeated violations of driving laws by Ms. Newell. Marion police had apparently notified Ms. Newell of the situation that past Monday, August 7, 2023.

31. According to the story, Ms. Newell also accused Vice-Mayor Herbel of "negligently and recklessly" sharing her personal information during the council meeting – she wanted to speak to the council so her colleagues would know "how vile [Herbel's] behavior can be."

32. At the time of the city council meeting, Ms. Newell did not have a Kansas liquor license and the liquor license for her new restaurant, Chef's Plate at Parlour 1886, was still carried under the name of the prior owner, Ms. Ensey.

33. Ms. Ensey's liquor license was apparently set to expire later in August.

34. The story further stated that during the post-council meeting discussion with the *Record*, Ms. Newell also indicated she thought the information had been supplied to the source – whose identity she speculated about – by her estranged husband as part of an attempt in divorce proceedings to retain ownership of vehicles on the grounds that she did not possess a license.

### *The Warrant*

35. On Friday, August 11, 2023, Chief Cody delivered an *Application for Search Warrant* to Marion County District Court Magistrate Judge Laura E. Viar, who had been a Magistrate Judge since 2022.

36. By August 11, Chief Cody had been serving as Marion Police Chief while knowingly under investigation by Ms. Gruver and the *Record* for alleged prior misconduct since

6

the time of his application and hiring, had removed *Record* personnel from a public meet-and-greet session with a United States Congressman at the request of a restaurant owner, Ms. Newell, and had become aware of the *Record's* acquisition of public information about Ms. Newell's past drunken-driving arrest, which had caused an inflamed response by Ms. Newell – the same person who had become angry after apparently overhearing Ms. Gruver's telephonic conversation with a source in April.

37. By August 11, Chief Cody had also directly expressed to reporter Phyllis Zorn his support for her work – telling her that Eric Meyer and Deb Gruver were the real problem with the paper.

38. Investigation remains ongoing as to whether Marion County Attorney Joel Ensey had any direct involvement in reviewing, approving and/or presenting the *Application*.

39. In the Affiant's attestation to the application, Magistrate Judge Viar scratched out the "Notary" line and verified Chief Cody's signature as "Magistrate Viar."

40. In the sworn *Application*, Chief Cody recounted in some detail the recent history involving the *Record's* ouster from Kari's Kitchen on August 1 and the access of Kari Newell's KDOR records on the public website by *Record* personnel.

41. While referencing Pam Maag in the *Application*, Chief Cody provided no indication he had ever made the effort to interview Ms. Maag about the situation.

42. In the *Application*, Chief Cody claimed that downloading of the KDOR records involved "either impersonating the victim or lying about the reasons why the record was being sought."

43. In the *Application*, Chief Cody stated that the alleged perpetrator of this alleged crime was not unknown – it was *Record* reporter Phyllis Zorn.

44. In the *Application*, Chief Cody did not address or acknowledge any federal or state laws which might preclude his intended search or reflect that Ms. Zorn's online search was not, in fact, illegal.

45. In the *Application,* Chief Cody did not assert any specific nexus between plaintiff Deb Gruver's personal cellular phone and the alleged crime being investigated – Deb Gruver was never once mentioned in the nine-page *Affidavit*, and neither was her personal cellular phone.

46. In the *Application,* Chief Cody did not assert any factual basis for believing that any *Record* employee's cellular phone or device aside from Phyllis Zorn's could have possibly been used to access the Kansas Department of Revenue records website.

47. Chief Cody did not separately submit an application seeking to search either Ms. Gruver's residence or Ms. Zorn's residence – only the *Record's* offices, the publisher's home and the Vice-Mayor's home.

48. In the *Application* and resulting *Warrant*, Chief Cody sought and was granted access to "2. Digital Communications devices allowing access to the Internet or to cellular digital networks which **were or have been used** to access the Kansas Department of Revenue records website."  (emphasis added)

49. In the *Application* and resulting *Warrant,* Chief Cody sought and was granted access to "3. A computer or digital device that **has been used** to access the Kansas Department of Revenue records website."  (emphasis added)

50. In the *Application* and resulting *Warrant*, Chief Cody sought and was granted access to "5. **Conduct a preview search** of all located digital communications devices and digital storage media **to exclude from seizure those which have not been involved in the identity theft**, by use of manual or automated preview tools."  (emphasis added)

8

51. Magistrate Judge Viar executed the *Search Warrant* at 9:00 a.m. on Friday, August 11, 2023.

*The Raid*



52. The photograph above shows Chief Cody directing and participating in the raid while his officers seize equipment from the *Record's* offices. Ms. Gruver's desk is shown on the bottom right.

53. After obtaining Magistrate Judge Viar's signature on the *Search Warrant*, Chief Cody ventured across the street to the *Record's* offices and spearheaded the raid, with the assistance of four other Marion Police Department officers and two Sheriff's Deputies.

54. Chief Cody first handed Ms. Gruver the *Warrant* when he arrived, and as she began to read it, she began to access her personal cellular phone – telling Chief Cody that she needed to call Eric Meyer.

55. Chief Cody responded by reaching over the papers and snatching the phone out of her hand.

56. The personal cellular phone was taken directly from Ms. Gruver's person and had not been left in the offices.

57. There was no factual basis to believe Ms. Gruver's personal cellular phone was evidence of the alleged crime, or any crime.

58. Ms. Gruver's cellular phone was not verified as having "been used to access the Kansas Department of Revenue records website."

59. Rather than conducting a preview search on site to "exclude from seizure" a personal cellular phone which had "not been involved in the [alleged] identity theft," Chief Cody seized the phone and removed it from the premises along with the other equipment.

60. One of the officers also read Ms. Gruver, Ms. Zorn and an office administrator their *Miranda* rights while Chief Cody watched, though she was never placed under arrest.

61. At Chief Cody's direction, the law enforcement officers began removing equipment, including the computer towers of Mr. Meyer, Ms. Zorn and Ms. Gruver, a server tower, an external drive and the personal cellular phones of Ms. Gruver and Ms. Zorn.

62. The raid continued unabated for three-plus hours while Ms. Gruver and the other *Record* staff were forced to wait outside in temperatures that had reached 100ºF by 4:00 p.m.

63. After leaving the *Record's* offices, Chief Cody and his law enforcement team proceeded to execute the two additional signed warrants at the two private residences – Eric and Joan Meyer's and Vice-Mayor Herbel's – seizing additional equipment at those locations.

64. In the below photograph, 98-year-old Joan Meyer is seen speaking with officers during the August 11, 2023, raid on her home – one day prior to her death from cardiac arrest:



*The Aftermath*

65. Later that day, after Chief Cody's raid on the *Record's* offices was completed, Ms. Gruver went over to the Marion County Sheriff's office in an attempt to retrieve her personal cellular phone.

66. Ms. Gruver spoke with Chief Cody inside the office and requested her phone back – telling Chief Cody she had nothing to do with any search of the driving records.

67. "I actually believe you," Chief Cody replied with a grin.

68. The raid ultimately made international news in the days to follow, with Chief Cody's behavior being universally questioned by major news outlets, constitutional scholars and even addressed by the White House Press Secretary in a daily press briefing.

69. In the days which followed, Chief Cody remained insistent that his search and seizure had been lawful. He made the following Facebook post on the Marion, Kansas Police Department's page on August 12, 2023, at 10:48 a.m.[2]:

---

[2] https://www.facebook.com/story.php?story_fbid=pfbid02g2orRAMmqkGGCeRxMUPL8E5kjL5N3QMJiiejzmSQbQQbviRKoUGMjYiZZxDsv57TI&id=100064381373990&mibextid=ZbWKwL (accessed August 30, 2023).



70. In his post, Chief Cody acknowledged that he had been aware of the "Privacy Protection Act of 1980," found at 42 U.S.C. § 2000aa *et seq.,* which requires in most situations that law enforcement seek to obtain material from journalists through a subpoena, rather than through a surprise search conducted with a warrant.

71. Chief Cody claimed an exception to the statute, however, which applies when "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate."  42 U.S.C. § 2000aa(b)(1).

72. Chief Cody did not explain in his post how there could have been probable cause to believe that Ms. Gruver had committed identity theft, or any other crime.

73. Chief Cody also failed to acknowledge K.S.A. 60-483 in his post, which provides that a journalist shall be entitled to a hearing when asserting a claim of privilege for any information gathered, received or processed.

74. Contrary to Chief Cody's statement that the department would be "vindicated," Marion County Attorney Ensey announced in a release on Wednesday, August 16th that he was

withdrawing the August 11 warrants and had asked the court to release the evidence seized so that it could be returned to the owners of the property by law enforcement.

75. In support of his determination, County Attorney Ensey stated in the release: "I have come to the conclusion that insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized."

76. The Kansas Bureau of Investigation announced in an August 16, 2023, release that the investigation into the underlying data breach would continue under its jurisdiction, without review or examination of any of the evidence seized on Friday, August 11, 2023.

## THE PARTIES, JURISDICTION & VENUE

Plaintiff hereby adopts by reference paragraphs one through seventy-six (1-76) inclusive, and, in addition, further states and alleges:

77. Plaintiff, DEB GRUVER ("plaintiff Gruver" or "Ms. Gruver") is an adult individual and a citizen of Kansas, residing in Wichita, Sedgwick County.

78. Defendant, CHIEF GIDEON CODY, MARION, KANSAS POLICE DEPARTMENT ("Chief Cody" or "defendant Cody"), was at all times relevant herein, and remains at the time of this filing the Chief of the Marion, Kansas Police Department. Chief Cody is a citizen of the State of Kansas and upon belief maintains his principal residence in Marion County, Kansas. Chief Cody is being sued in his individual capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims. Chief Cody may be served with process personally.

79. Jurisdiction of this action is conferred by 28 U.S.C. § 1331, which provides original "federal question" jurisdiction over all civil actions arising under the United States Constitution and laws or treaties of the United States. Jurisdiction is further conferred by 28 U.S.C. § 1343(a)(3), which provides for original jurisdiction in suits authorized by 42 U.S.C. § 1983.

13

80. Plaintiff Gruver's claims for damages herein are authorized by: (1) 42 U.S.C. § 1983, which provides for redress for the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States; (2) the First Amendment of the United States Constitution, which protects freedom of speech and the press; (3) the Fourth Amendment of the United States Constitution, which protects the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; (4) 42 U.S.C. § 1988, which allows the prevailing party to collect a reasonable attorney's fee as costs in any action or proceeding to enforce 42 U.S.C. § 1983.

81. Venue is proper in the U.S. District Court for the District of Kansas under 28 U.S.C. § 1391(b)(1) & (2), as defendant Cody is a citizen of Marion, Kansas and the events giving rise to plaintiff Gruver's claims occurred in Marion, Kansas.

82. This action asserts no claims under the Kansas Tort Claims Act and thus the notice provisions of K.S.A. 12-105b(d) are inapplicable.

**FIRST COUNT:** *Violation of Plaintiff Gruver's Rights under the First Amendment of the United States Constitution & 42 U.S.C. § 1983*

Plaintiff hereby adopts by reference paragraphs one through eighty-two (1-82) inclusive, and, in addition, further states and alleges:

83. Under 42 U.S.C. § 1983, a person may recover damages for a deprivation of his or her constitutionally protected rights when that injury is inflicted under color of state law.  Chief Cody acted in his individual capacity as Chief of the Marion, Kansas Police Department under color of state law when he signed an unreasonable and unlawful *Application for Search Warrant* and executed on an unreasonable and unlawful *Search Warrant* on August 11, 2023.

84. The *Application* was facially invalid in that it contended a search on a public-facing governmental website was illegal and contradicted the federal and/or state laws protecting journalists from search and seizure of journalistic materials.

85. The *Application* and *Warrant* were substantively invalid as existing evidence did not establish a legally sufficient nexus between the alleged crime and the places searched and items seized.

86. In executing on the unreasonable and unlawful *Search Warrant*, Chief Cody exceeded the scope of the warrant by seizing Ms. Gruver's personal cellular phone from her person, despite the fact that neither Ms. Gruver nor her personal cellular phone were referenced anywhere in the *Application* or *Warrant*, there was no evidence to suggest that the seized property was evidence of a crime, there was no evidence to establish that the personal cellular phone had been used to access the Kansas Department of Revenue records website, the scope of the warrant only authorized at most a preview to exclude the personal cellular phone from seizure, and Kansas law established that a person's mere nearness to others independently suspected of criminal activity does not, without more evidence, give rise to probable cause to search that person.

87. In seizing Ms. Gruver's personal cellular phone despite the seizure exceeding the scope of the unreasonable and unlawful search warrant, Chief Cody acted in unreasonable and unnecessarily violent fashion, causing injury to plaintiff's Gruver's rights and her person.

88. Such acts were done by Chief Cody in retaliation for Ms. Gruver exercising her protected rights under the First Amendment of the United States Constitution as a reporter for the *Record*, which protects freedom of speech and freedom of the press.

89. Upon belief, Ms. Gruver's affiliation with the *Marion County Record*, which had investigated his alleged prior acts of misconduct and recently published the story about Ms.

Newell's prior driving history, sparked Chief Cody's desire for retaliation against her personally, in violation of her First Amendment rights.

90. Defendant Cody is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights. Because his action was malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, he may be subjected to punitive damages.

91. Chief Cody's unlawful and unreasonable *Applications, Warrants*, searches and seizures at the homes of Eric & Joan Meyer and Ruth Herbel are further evidence of his malicious intent.

92. As a direct and proximate result of defendant Cody's conduct violating Ms. Gruver's constitutional rights, plaintiff Gruver has sustained damages, including, but not limited to, emotional distress, mental anguish and physical injury. Defendant Cody's malicious and recklessly indifferent acts justify an award of punitive damages.

**SECOND COUNT:** *Violation of Plaintiff Gruver's Rights under the Fourth Amendment of the United States Constitution & 42 U.S.C. § 1983*

Plaintiff hereby adopts by reference paragraphs one through ninety-two (1-92) inclusive, and, in addition, further states and alleges:

93. Under 42 U.S.C. § 1983, a person may recover damages for a deprivation of his or her constitutionally protected rights when that injury is inflicted under color of state law. Chief Cody acted in his individual capacity as Chief of the Marion, Kansas Police Department under color of state law when he signed an unreasonable and unlawful *Application for Search Warrant* and executed on an unreasonable and unlawful *Search Warrant* on August 11, 2023.

94. The *Application* was facially invalid in that it contended a search on a public-facing governmental website was illegal and contradicted the federal and/or state laws protecting journalists from search and seizure of journalistic materials.

95. The *Application* and *Warrant* were substantively invalid as existing evidence did not establish a legally sufficient nexus between the alleged crime and the places searched and items seized.

96. In executing on the unreasonable and unlawful *Search Warrant*, Chief Cody exceeded the scope of the warrant by seizing Ms. Gruver's personal cellular phone from her person, despite the fact that neither Ms. Gruver nor her personal cellular phone were referenced anywhere in the *Application* or *Warrant*, there was no evidence to suggest that the seized property was evidence of a crime, there was no evidence to establish that the personal cellular phone had been used to access the Kansas Department of Revenue records website, the scope of the warrant only authorized at most a preview to exclude the personal cellular phone from seizure, and Kansas law established that a person's mere nearness to others independently suspected of criminal activity does not, without more evidence, give rise to probable cause to search that person.

97. In seizing Ms. Gruver's personal cellular phone despite the seizure exceeding the scope of the unreasonable and unlawful search warrant, Chief Cody acted in unreasonable and unnecessarily violent fashion, causing injury to plaintiff's Gruver's rights and her person.

98. Such acts were done by Chief Cody in violation of Ms. Gruver's protected rights under the Fourth Amendment of the United States Constitution, which protects citizens from unreasonable and unlawful searches and seizures.

99. No reasonable officer in Chief Cody's position would have believed the seizure of Ms. Gruver's personal cellular phone constitutionally complied with the Fourth Amendment of the United States Constitution.

100. Defendant Cody is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights. Because his action was malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, he may be subjected to punitive damages.

101. Chief Cody's unlawful and unreasonable *Applications, Warrants*, searches and seizures at the homes of Eric & Joan Meyer and Ruth Herbel are further evidence of his malicious intent.

102. As a direct and proximate result of defendant Cody's conduct violating Ms. Gruver's constitutional rights, plaintiff Gruver has sustained damages, including, but not limited to, emotional distress, mental anguish and physical injury. Defendant Cody's malicious and recklessly indifferent acts justify an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DEBBIE K. "DEB" GRUVER prays for damages against the defendant as follows: (1) compensatory damages in excess of $75,000.00; (2) punitive damages in excess of $75,000.00; and (3) costs, expenses and reasonable attorney's fees pursuant to K.S.A. 42 U.S.C. § 1988. Plaintiff further requests any other relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff DEBBIE K. "DEB" GRUVER hereby demands a trial by jury. Pursuant to D. Kan. Local R. 40.2, plaintiff will file a Designation of Place of Trial contemporaneous to the filing of her Complaint, designating Wichita, Kansas as the Place of Trial.

Respectfully submitted,

HUTTON & HUTTON

*/s/ Blake A. Shuart, #24463*
Blake A. Shuart, #24463
Andrew W. Hutton, #10264
J. Darin Hayes, #16755
Matthew M. Dwyer, #22492
Kaylea D. Knappenberger, #28902
8100 E. 22nd St. N., Bldg. 1200
Wichita, KS  67226
Phone: (316) 688-1166
Fax: (316) 686-1077
E-Mail: Blake.Shuart@huttonlaw.com
*Attorneys for Plaintiff*

19