## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DEBBIE K. "DEB" GRUVER, | |
 | |
 *Plaintiff*, | |
 | |
vs. | |
 | |
FORMER CHIEF GIDEON CODY, | |
MARION, KANSAS POLICE DEPARTMENT, | |
in his individual capacity, | |
 | |
MARION COUNTY ATTORNEY JOEL ENSEY, | Case No. 6:23-cv-01179-DDC-GEB
in his individual capacity, | |
 | |
& | |
 | |
MARION COUNTY SHERIFF JEFF SOYEZ, | |
in his individual capacity, | |
 | |
 *Defendants*. | |

## FIRST AMENDED COMPLAINT

COMES NOW the plaintiff, DEBBIE K. "DEB" GRUVER, through her undersigned counsel of record, and in support of her claims against the defendants, FORMER CHIEF GIDEON CODY, MARION, KANSAS POLICE DEPARTMENT, in his individual capacity; MARION COUNTY ATTORNEY JOEL ENSEY, in his individual capacity; and MARION COUNTY SHERIFF JEFF SOYEZ, in his individual capacity, hereby states and alleges as follows:

## INTRODUCTION

1.      This action arises from a shocking, unprecedented and unconstitutional police raid in Marion, Kansas, a small Kansas town of approximately 1,900 citizens. Targeted in the Friday, August 11, 2023, raid were the offices and personnel of the local newspaper, the *Marion County Record.*

2.      Separately targeted by police during the August 11 raids were two other nearby homes: (1) the home of the paper's co-owner and publisher, Eric Meyer, and the paper's 98-year-old co-owner – Eric's mother, Joan Meyer; and (2) the home of the city's Vice-Mayor, Ruth Herbel.  Joan Meyer died the following day at 2:53 p.m. of sudden cardiac arrest.

3.      On August 11, Chief Gideon Cody of the Marion Police Department obtained and executed three search warrants for a newspaper's offices and two private homes ostensibly because a previously identified *Record* reporter, Phyllis Zorn, had accessed a local citizen's driving records from a public website, culminating in the seizure of 18 items including computer towers, a server tower, personal cellular phones, laptops, a router and an external hard drive.

4.      *Marion County Record* reporter Deb Gruver, whose personal cellular phone was snatched away by Chief Cody during the raid on the *Record's* offices while she sat outside the building, now seeks justice and accountability under 42 U.S.C. § 1983 for Chief Cody's malicious and recklessly indifferent violation of her rights under the First and Fourth Amendments of the United States Constitution.

5.      In this amended suit, Ms. Gruver now seeks accountability under 42 U.S.C. § 1983 for the brazen constitutional violations of two additional defendants: Marion County Attorney Joel Ensey – who has made every effort to minimize his role in the raid to date, after acknowledging in a Press Release that the warrants were invalid; and Marion County Sheriff Jeff Soyez, who was instrumental in all aspects of the raid – from the opening salvo to the celebratory post-raid pizza party.

6.      This *First Amended Complaint* is filed pursuant to Fed. R. Civ. P. 15(a)(2).

## STATEMENT OF FACTS

Plaintiff hereby adopts by reference paragraphs one through six (1-6) inclusive, and, in addition, further states and alleges:

### *Lead-Up to the Raid*

7.      Deb Gruver is an award-winning journalist who began working as a Staff Writer with the *Marion County Record* in 2022 under Eric Meyer, the paper's co-owner and publisher. The *Record* is a weekly newspaper with offices located directly across the street from the Marion County District Courthouse.

8.      In August 2022, Ms. Gruver was new to town and sought out popular local establishments for review.  She ended up dining at the Parlour 1886 restaurant inside the Historic Elgin Hotel and wrote a glowing review, complimenting chef Kari Newell's spatchcock chicken with whole new potatoes and asparagus, followed by the "Death by Chocolate" cake for dessert. Chef Newell "outdid herself," Gruver wrote.

9.      On February 1, 2023, chef Newell took over ownership of the restaurant, changing the name to Chef's Plate at Parlour 1886.  The restaurant remained within the Historic Elgin Hotel, which was co-owned and operated by Tammy Ensey – the sister-in-law of Marion County Attorney Joel Ensey.

10.     Ms. Gruver and Ms. Newell maintained a friendly relationship until late April 2023, around the time of Chief Cody's hiring, when the relationship broke down.  Ms. Newell criticized Ms. Gruver's reporting and complained about her talking to "sources" while inside the restaurant – apparently after overhearing a telephone call.

11.     "I'm not the one [to mess with]," Ms. Newell told Ms. Gruver in a contentious text exchange.

12.     In June 2023, Ms. Newell opened a coffee shop, Kari's Kitchen, directly across the street from the Elgin Hotel.

13.     In June 2023, Ms. Newell's two restaurants, the offices of the *Marion County Record* and the Marion Police Department were all located within blocks of each other near downtown Marion.

14.      Meanwhile, on April 21, 2023, the *Record* confirmed that Gideon Cody had accepted a job offer from Marion Mayor David Mayfield to become the new Chief of the Marion Police Department.  Chief Cody came to Marion after 24 years with the Kansas City, Missouri Police Department, where he had most recently served as a Captain.

15.     In mid-to-late April 2023, around the time of Chief Cody's application for the job, the *Marion County Record* began investigating various allegations against Cody, based on anonymous sources who had worked with Cody in Kansas City but declined to go on record with their claims.

16.     The *Record* could not obtain Cody's personnel file from the KCMO police department to independently verify the allegations, so it did not publish the story at the time.

17.     Cody, however, was aware of the *Record's* investigation into his prior professional conduct.

18.     Specifically, Cody was aware that Ms. Gruver was the one conducting the investigation, having discussed the investigation with her around the time of his hiring in April 2023.

19.     On August 1, 2023, Kari's Kitchen hosted a public meet-and-greet event with United States Representative Jake LaTurner (R, 2nd Dist.), whose constituents as a congressman included the citizens of Marion.

4

20.     Three of the five members of the Marion County Board of County Commissioners were present at the public event.

21.     Mr. Meyer and a *Record* reporter, Phyllis Zorn, attended the event and were in line attempting to buy coffee when Chief Cody approached them and advised that Ms. Newell had asked them to leave.

22.     Newell later confirmed to reporters that she had asked Meyer and his reporter, Zorn, to leave, because she believed the newspaper "has a long-standing reputation for twisting and contorting comments within our community."

23.     Some of the events which then occurred between Friday, August 4, and Monday, August 7, were covered in a newspaper story written by Eric Meyer and published on Wednesday, August 9, 2023.

24.     The story, titled "Restaurateur accuses paper, councilwoman[1]" stated that Ms. Newell appeared before the Marion City Council on Monday, August 7 – less than one week after ejecting *Record* reporters from Congressman LaTurner's reception – and accused the *Record* of illegally obtaining drunken-driving information about her and then providing it to a city council member, Vice-Mayor Herbel.

25.     The story further stated that the *Record* and Vice-Mayor Herbel had both separately received information from a confidential source indicating that Ms. Newell's license had been suspended in 2008 due to a drunken-driving conviction and other driving infractions.

26.     The story further stated that Ms. Newell had confirmed to the *Record* directly after the council meeting in a discussion she initiated that the information was accurate.

---

[1]

http://peabodykansas.com/direct/restaurateur_accuses_paper_councilwoman+5447newell+52657374617572617465 7572206163637573657320700617065722c20636f756e636f776c776f6d616e (accessed May 11, 2024).

27.    The story further stated that the *Record* had separately verified the information was accurate and had been obtained from a public website but had nevertheless decided against publishing the story.

28.    In fact, *Record* reporter Phyllis Zorn had confirmed the accuracy of this information – which she had originally received from a local resident, Pam Maag, via a screenshot sent through Facebook – on the public Kansas Department of Revenue Driver's License Check website.

29.    After receiving the screenshot and seeking to independently verify the information, Ms. Zorn had reached out to the Department of Revenue to ask how to obtain the information, and they directed her to the same link she ultimately utilized.

30.    Kansas Department of Revenue spokesperson Zack Denney would later confirm to news outlets that the online search was legal.  "The website is public-facing, and anyone can use it," he said.

31.    The federal Driver's Privacy Protection Act, 18 U.S.C. 2721 (b)(5), allows access to information about a person's driver's status for research activities, so long as the personal information is not published, redisclosed, or used to contact individuals.  In this instance, the information was used to verify the confidential source's information and was not published.

32.    Instead of publishing the story, the *Record* consulted with an attorney and notified Chief Cody and Sheriff Soyez on August 4, 2023, that the source had alleged local law enforcement was aware that Ms. Newell did not have a valid driver's license and had ignored repeated violations of driving laws by Ms. Newell.

33.    According to the *Record's* story, Ms. Newell also accused Vice-Mayor Herbel of "negligently and recklessly" sharing her personal information during the council meeting – she

wanted to speak to the council so her colleagues would know "how vile [Herbel's] behavior can be."

34.     At the time of the city council meeting, Ms. Newell did not have a Kansas liquor license and the liquor license for her new restaurant, Chef's Plate at Parlour 1886, was still carried under the name of the prior owner, Ms. Ensey.

35.     Ms. Ensey's liquor license was apparently set to expire later in August.

36.     The story further stated that during the post-council meeting discussion with the *Record*, Ms. Newell also indicated she thought the information had been supplied to the source – whose identity she speculated about – by her estranged husband as part of an attempt in divorce proceedings to retain ownership of vehicles on the grounds that she did not possess a license.

### The Application & Warrant

37.     On Friday, August 11, 2023, Marion County Attorney Joel Ensey's staff delivered an *Application for Search Warrant* to Eighth Judicial District Magistrate Judge Laura E. Viar, who had been a Magistrate Judge since 2022, after formerly serving as Morris County Attorney.

38.     The *Application* sought a search warrant for "117 S. 3rd Street, Marion, Marion County, Kansas *** Above the glass is a sign that says "Marion County Record".

39.     By August 11, Chief Cody had been serving as Marion Police Chief while knowingly under investigation by Ms. Gruver and the *Record* since the time of his application and hiring, had removed *Record* personnel from a public meet-and-greet session with a United States Congressman at the request of a restaurant owner, Ms. Newell, and had become aware of the *Record's* acquisition of public information about Ms. Newell's past drunken-driving arrest, which had caused an inflamed response by Ms. Newell – the same person who had become angry after apparently overhearing Ms. Gruver's telephonic conversation with a source in April.

40.     By August 11, Chief Cody had also directly expressed to reporter Phyllis Zorn his support for her work – telling her that Eric Meyer and Deb Gruver were the real problem with the paper.

41.     In the sworn *Application*, Chief Cody attested he had probable cause to believe that two offenses against the laws of the State of Kansas had been committed: (1) K.S.A. 21-6107 – Identity Theft; and (2) K.S.A. 21-5839 – Unlawful Acts Concerning Computers.

42.     In the Affiant's attestation to the application, Magistrate Judge Viar scratched out the "Notary" line and verified Chief Cody's signature as "Magistrate Viar."

43.     In the sworn *Application*, Chief Cody recounted in some detail the recent history involving the *Record's* ouster from Kari's Kitchen on August 1 and the access of Kari Newell's KDOR records on the public website by *Record* reporter Phyllis Zorn.

44.     While referencing Pam Maag in the *Application*, Chief Cody presented no information about Maag's involvement, other than to say she had originally provided the screenshot of the Newell KDOR record to Vice-Mayor Herbel.

45.     In the *Application*, Chief Cody claimed that downloading of the KDOR records involved "either impersonating the victim or lying about the reasons why the record was being sought."

46.     In the *Application*, Chief Cody stated that the individual who had allegedly "impersonat[ed] the 'victim' or [lied] about the reasons why the record was being sought" was not unknown – it was *Record* reporter Phyllis Zorn.

47.     In the *Application*, Chief Cody did not address or acknowledge any federal or state laws which might preclude his intended search or reflect that Ms. Zorn's online search was not, in fact, illegal.

48.     In the *Application,* Chief Cody did not assert any specific nexus between plaintiff Deb Gruver's personal cellular phone and the alleged crime being investigated – Deb Gruver was never once mentioned in the nine-page *Affidavit*, and neither was her personal cellular phone.

49.     In the *Application,* Chief Cody did not assert any factual basis for believing that any *Record* employee's cellular phone or device aside from Phyllis Zorn's computer could have possibly been used to access the Kansas Department of Revenue records website.

50.     In the *Application*, Chief Cody did not disclose or reference, in whole or in part, that the Eric Meyer e-mail of August 4, 2023, included the following statement from Mr. Meyer: "We initially were concerned whether the letter was accurate and, if so, whether it was obtained legally.  Our lawyer's advice was that the information most likely would be available as public record and, therefore, it would not be illegal for us to possess the document, depending on how our source obtained it."

51.     The *Application* did not include any information stating or suggesting that the suspect(s) of the alleged crime obtained the KDOR records in order to defraud another person.

52.     The *Application* did not include any information stating or suggesting that the suspect(s) of the alleged crime obtained the KDOR records in order to misrepresent another person.

53.     The *Application* did not include any information stating or suggesting that the suspect(s) of the alleged crime obtained the KDOR records in order to subject another person to economic or bodily harm.

54.     In the *Application* and resulting *Warrant*, Chief Cody sought and was granted access to "2. Digital Communications devices allowing access to the Internet or to cellular digital networks which **were or have been used** to access the Kansas Department of Revenue records website."  (emphasis added)

55.     In the *Application* and resulting *Warrant,* Chief Cody sought and was granted access to "3. A computer or digital device that **has been used** to access the Kansas Department of Revenue records website."  (emphasis added)

56.     In the *Application* and resulting *Warrant*, Chief Cody sought and was granted access to "5. **Conduct a preview search** of all located digital communications devices and digital storage media **to exclude from seizure those which have not been involved in the identity theft**, by use of manual or automated preview tools."  (emphasis added)

57.     Magistrate Judge Viar executed the *Search Warrant* at 9:00 a.m. on Friday, August 11, 2023.

58.      Chief Cody did not separately submit an application seeking to search either Ms. Gruver's residence or Ms. Zorn's residence.

59.     Chief Cody did seek and obtain two additional warrants: (1) A warrant for the premises located at 611 S. Freeborn Street, Marion, Kansas, which was the home address of Marion, Kansas Vice-Mayor Ruth Herbel; and (2) A warrant for the premises located at 425 Locust Street, Marion, Kansas, which was the home address of *Record* publisher Eric Meyer and his mother, *Record* co-owner Joan Meyer.

60.     Similar to the *Application* & *Warrant* for the *Record's* offices, neither the 611 S. Freeborn warrant nor the 425 Locust warrant mentioned Ms. Gruver in any way, by suggestion or otherwise.

61.     A fourth application, for Pam Maag's home, was rejected by Magistrate Viar.

***The Raid***



62.     The photograph above shows Chief Cody directing and participating in the raid while his officers seize equipment from the *Record's* offices.  Ms. Gruver's desk is shown on the bottom right.

63.     After obtaining Magistrate Judge Viar's signature on the *Search Warrant*, Chief Cody ventured over to the *Record's* offices and spearheaded the raid, with the assistance of additional Marion Police Department officers and Sheriff's Deputies.

64.     When Chief Cody arrived at the *Record's* offices, he approached Ms. Gruver, who was sitting next to Ms. Zorn on the steps **outside** the rear of the building.

65.     Chief Cody then handed Ms. Gruver a copy of the *Warrant.*

66.     Now standing behind her as she remained seated on the steps outside the building, Chief Cody then told Ms. Gruver, "we got all electronic devices."

67.     Chief Cody then went in front of Ms. Gruver as she remained in a seated position outside the building holding the *Warrant* and again said "we got all electronic devices."

68.     Ms. Gruver advised that she needed to call Eric Meyer, the owner of the premises.

69.     Chief Cody responded by reaching over the papers and violently snatching the phone out of Ms. Gruver's hand, without saying anything further at that time.

70.     The below still frames taken from body camera footage display Chief Cody snatching Ms. Gruver's personal cellular phone from her person as she sat outside the *Record's* offices in the course of effectuating an illegal search warrant that had nothing whatsoever to do with Ms. Gruver:



71.     The personal cellular phone was taken directly from Ms. Gruver's person and had not been left in the offices.

72.     There was no factual basis to believe Ms. Gruver's personal cellular phone was evidence of the alleged crime, or any crime.

73.     Ms. Gruver's cellular phone was not verified as having "been used to access the Kansas Department of Revenue records website."

74.     Rather than conducting a preview search on site to "exclude from seizure" a personal cellular phone which had "not been involved in the [alleged] identity theft," Chief Cody seized the phone and removed it from the premises along with the other equipment.

75.     One of the officers read Ms. Gruver, Ms. Zorn and an office administrator their *Miranda* rights while Chief Cody watched, though they were never placed under arrest.  This occurred after Chief Cody attempted to *Mirandize* Ms. Zorn but determined he was unable to recall the wording of the *Miranda* warning.

76.     At Chief Cody's direction, the law enforcement officers began removing equipment, including the computer towers of Mr. Meyer, Ms. Zorn and Ms. Gruver, a server tower, an external drive and the personal cellular phones of Ms. Gruver and Ms. Zorn.

77.     The raid continued unabated for three-plus hours while Ms. Gruver and the other *Record* staff were forced to wait outside in temperatures that had reached 100ºF by 4:00 p.m.

78.     At one point during the raid, Marion Police Officer Hudlin rifled through Ms. Gruver's personal work files and advised Chief Cody he might "[W]ant to look through this desk? *** You will understand shortly."

79.     In fact, Officer Hudlin had located Ms. Gruver's file on "Capt. Gideon Cody" containing identifying information on CIs she had spoken with in the course of her investigation of Chief Cody.

80.     Chief Cody then bent down to look at the file, before muttering "Hmm…Keeping a personal file on me."

81.     Chief Cody and his law enforcement team also executed the two additional signed *Warrants* at the two private residences that day – Eric and Joan Meyer's home and Vice-Mayor Herbel's home – seizing additional items at those locations.

85.     In the below photograph, 98-year-old Joan Meyer is seen speaking with officers during the August 11, 2023, raid on her home – one day prior to her death from cardiac arrest:



***The Aftermath***

86.     Later that day, after Chief Cody's raid on the *Record's* offices was completed, Ms. Gruver went over to the Marion County Sheriff's office in an attempt to retrieve her personal cellular phone.

87.     Ms. Gruver spoke with Chief Cody inside the office and requested her phone back – telling Chief Cody she had nothing to do with any search of the driving records.

88.     "I actually believe you," Chief Cody replied with a grin.  He would not return the illegally seized personal cellular phone, however.

89.     After the raid on the *Record's* offices that day, Chief Cody called Kari Newell from his police vehicle to brag about his desecration of the United States Constitution – blissfully unaware that he was recording himself in the process (as featured in the below image):



14

90.     Kari Newell answered defendant Cody's call, saying "hey."

91.     Chief Cody responded, "hey, honey, we can't write anything, so…"

92.     Kari Newell responded, "yeah, no, I understand…I just got a message from somebody at the hotel saying that the whole staff of the newspaper's out on the sidewalk and all the computer equipment's leaving the building."

93.     Chief Cody responded, "yeah, surprising how that works, isn't it?"

94.     The raid ultimately made international news in the days to follow, with Chief Cody's behavior being universally questioned by major news outlets, constitutional scholars and even addressed by the White House Press Secretary in a daily press briefing.

95.     In the days which followed, Chief Cody remained insistent that his search and seizure had been lawful.  He made the following Facebook post on the Marion, Kansas Police Department's page on August 12, 2023, at 10:48 a.m.[2]:



Marion, Kansas Police Department
August 12 at 10:48 AM · 

The Marion Kansas Police Department has has several inquiries regarding an ongoing investigation.

As much as I would like to give everyone details on a criminal investigation I cannot.  I believe when the rest of the story is available to the public, the judicial system that is being questioned will be vindicated.

I appreciate all the assistance from all the State and Local investigators along with the entire judicial process thus far.

Speaking in generalities, the federal Privacy Protection Act, 42 U.S.C. §§ 2000aa-2000aa-12, does protect journalists from most searches of newsrooms by federal and state law enforcement officials.  It is true that in most cases, it requires police to use subpoenas, rather than search warrants, to search the premises of journalists unless they themselves are suspects in the offense that is the subject of the search.

The Act requires criminal investigators to get a subpoena instead of a search warrant when seeking "work product materials" and "documentary materials" from the press, except in circumstances, including: (1) when there is reason to believe the journalist is taking part in the underlying wrongdoing.

The Marion Kansas Police Department believes it is the fundamental duty of the police is to ensure the safety, security, and well-being of all members of the public. This commitment must remain steadfast and unbiased, unaffected by political or media influences, in order to uphold the principles of justice, equal protection, and the rule of law for everyone in the community.  The victim asks that we do all the law allows to ensure justice is served.  The Marion Kansas Police Department will nothing less.

😡😢 1.7K                                              6.5K comments   153 shares

---



2

https://www.facebook.com/story.php?story_fbid=pfbid02g2orRAMmqkGGCeRxMUPL8E5kjL5N3QMJiiejzmSQb QQbviRKoUGMjYiZZxDsv57TI&id=100064381373990&mibextid=ZbWKwL (accessed August 30, 2023).

96.     In his post, in which he uses the word "I" four times, Chief Cody acknowledged that he had been aware of the "Privacy Protection Act of 1980," found at 42 U.S.C. § 2000aa *et seq.,* which requires in most situations that law enforcement seek to obtain material from journalists through a subpoena, rather than through a surprise search conducted with a warrant.

97.     Chief Cody claimed an exception to the statute, however, which applies when "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate."  42 U.S.C. § 2000aa(b)(1).[3]

98.     Chief Cody did not explain in his post how there could have been probable cause to believe that Ms. Gruver had committed identity theft, or any other crime.

99.     Contrary to Chief Cody's statement that the department would be "vindicated," Marion County Attorney Ensey announced in a release (addressed further, *infra*) on Wednesday, August 16, that he was withdrawing the August 11 warrants and had asked the court to release the evidence seized so that it could be returned to the owners of the property by law enforcement.

100.     In support of his determination, County Attorney Ensey stated in the release: "I have come to the conclusion that insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized."

101.     The Kansas Bureau of Investigation announced in an August 16, 2023, release that the investigation into the underlying data breach would continue under its jurisdiction, without review or examination of any of the evidence seized on Friday, August 11, 2023.

102.     The Kansas Bureau of Investigation later referred the matter to the Colorado Bureau of Investigation for further handling and investigation.

---

[3] Even if this were a correct application of the federal statute to the facts, the Marion County Attorney would have no jurisdiction to prosecute such an offense.

103.    Further contrary to his statement that he would be "vindicated," Chief Cody was suspended on September 28 and announced his resignation, effective immediately, the following Monday, October 2.  He is now "Former Chief Cody."

### *New Evidence Develops – Involvement of County Attorney Ensey*

104.    In statements to the press following the raids, Marion County Attorney Joel Ensey continuously asserted that his involvement in the raids was being overstated.

105.    To the contrary, his statements were part of a carefully orchestrated effort to avoid being placed in the proverbial line of fire, knowing well that the fallout from the raids would be fast and heavy.

106.    In his original *Answer*, ¶22, Former Chief Cody asserted in part:

> "The Applications for Search Warrant taken by the County Attorney's Office to Judge Viar for approval had been *** discussed at length with County Attorney Joel Ensey ***."

&

> "On August 8, 2023, Chief Cody sent County Attorney Joel Ensey an email outlining potential criminal statutes that had been violated and a general summary of the facts that Cody believed would support finding that a crime had been committed.  Shortly after this email, Cody met with Ensey who gave his approval to move forward with the investigation.  Ensey called a meeting with the above-named law enforcement agencies [Marion Police Department, Marion County Sheriff & the Kansas Bureau of Investigation].  Despite participating in emails and meetings, Ensey has since advised Chief Cody that he did not actually read the documents that Cody sent to him including the draft search warrant affidavits and search warrants which were sent to him."

107.    Chief Cody's allegations are supported by the evidence obtained to date, which also support that County Attorney Ensey worked very closely in conjunction with professional colleagues to evaluate and attempt to minimize his personal liability for the raids.

108.    On the evening of Monday, August 7, 2023, Chief Cody sent a text to County Attorney Ensey, stating: "Call me tomorrow if you would.  I spoke to the victim and she is wanting to pursue misuse of office through the AGs office considering what happened at the council

meeting." County Attorney Ensey responded shortly thereafter, stating: "OK. I'll give you a call." "In the morning."

109.    On Tuesday, August 8, 2023, at 8:37 a.m., Chief Cody sent County Attorney Ensey a lengthy e-mail, titled "Crimes?" In his e-mail, Chief Cody floated all sorts of bizarre theories about laws that had been violated, including (1) The federal *Driver Privacy Protection Act* (DPPA), under which the Marion County Attorney's Office has no jurisdiction to charge; (2) wire fraud; (3) abuse of office/abuse of power; and (4) an entire section on "vicarious liability" and "co-conspirator liability."

110.    On Wednesday, August 9, 2023, Chief Cody sent County Attorney Ensey another text, again asking him to "[c]all me when you can this morning." He advised "[o]ther charges are coming" and "[i]t appears larger than when I looked at it first."

111.    On Thursday, August 10, 2023, at 11:24 a.m., Chief Cody e-mailed County Attorney Ensey the *Application* for the *Record's* offices, in addition to sending the other proposed applications in a group of e-mails.

112.    In a memo made to himself at 7:25 p.m. on Saturday, August 12 – the day after the raids – County Attorney Ensey acknowledged receiving the e-mails and opening them up, although he claimed he "had not fully reviewed them." This is an acknowledgment of having received, opened and reviewed the subject *Application*.

113.    In his memo, County Attorney Ensey also asserted he "knew that search warrants were being worked on, but I was not familiar with the subject matter, so it was outside of my comfort zone." This is an acknowledgment that he was aware of the subject matter of the ongoing investigation, which is also reinforced by the other text messages and e-mails referenced herein, as well as the allegations in Former Chief Cody's *Answer*.

114.    In his memo, County Attorney Ensey also asserted the following about the events of Friday, August 11: "The office manager, Karen Selznik, said that the chief had called and had a team on stand by to serve the search warrants.  I was not aware that this was being done.  I believe she asked me if I would like her to take them to the judge.  I told her she could take them up and let the judge decide.  I do believe I printed them off and gave them to her."  This is an acknowledgment that County Attorney Ensey had his office present the *Applications* and *Warrants* to Magistrate Judge Viar for approval and signature at Chief Cody's request – an act that would add credibility to the request over simply having a new, provisionally-accredited police officer (Cody) present the materials to the judge for consideration.

115.    The American Bar Association's Criminal Justice Standards for *Prosecutorial Investigations*, §2.8, "Search Warrants," recommends in §(d): "When the prosecutor is involved in an investigation, the prosecutor should review search warrant applications prior to their submission to a judicial officer.  In all other cases, the prosecutor should encourage police and law enforcement agents to seek prosecutorial review and approval of search warrants prior to their submission to a judicial officer."

116.    Further, in §(f), the ABA standards recommend: "In reviewing a search warrant application, the prosecutor should: (i) seek to assure the affidavit is complete, accurate and legally sufficient; (ii) seek to determine the veracity of the affiant and the accuracy of the information, especially when the application is based on information from a confidential informant; and (iii) seek to ensure that the affidavit is not misleading and does not omit material information which has a significant bearing on probable cause."

117.    The day after the raids, County Attorney Ensey began evaluating the scope – or lack thereof – of his potential immunity from liability.

118.     That morning, County Attorney Ensey spoke with a professional colleague about the *Mink v. Knox* case from the United States Court of Appeals for the Tenth Circuit, in which a prosecutor faced liability for reviewing and approving an affidavit and warrant, thus setting into motion a series of events the prosecutor knew, or reasonably should have known would cause others to deprive the person of their constitutional rights.

119.     On Tuesday, August 15, Ensey received advice that "every effort [should] be made to return the material seized to the owners in an expedited manner" because "[t]hese warrants will not sustain appellate review."

120.     Also on August 15, Ensey sent an e-mail to Chief Cody and Sheriff Soyez at 9:44 p.m., stating "I would like to have a meeting at the Sheriff's department at 11:30 to discuss matters and where we are moving forward.  Please let me know if you cannot make it."

121.     County Attorney Ensey then announced on Wednesday, August 16, that he believed the affidavits established probable cause to believe that an employee of the newspaper may have committed the crime of K.S.A. 21-5839, Unlawful Acts Concerning Computers (the second alleged crime of Identity Theft is not mentioned).

122.     County Attorney Ensey further advised in his Press Release of August 16, however, that he had "come to the conclusion that insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized."  As a result, County Attorney Ensey announced he had submitted a proposed order asking the court to release the evidence seized and had asked law enforcement to return the material seized to the owners of the property.

123.     County Attorney Ensey was substantively involved in both the investigative phase and the administrative phase of the investigation which contributed to the issuance of the *Warrant* that brought Chief Cody to the back doorstep of the *Record's* offices on August 11.

### Involvement of Marion County Sheriff Soyez

124.     Upon information, Marion County Sheriff Jeff Soyez and Former Chief Cody have been friends for many years – dating back to Soyez's tenure as a railroad detective in Kansas City, where Cody served as Captain with the KCMO PD – and it was Soyez who contacted Cody and encouraged him to apply for the open position at the Marion Police Department in April 2023.

125.     For his own part, Soyez had not been in Marion particularly long before the raids – having been appointed to the Sheriff's post in Marion County the year prior, in 2022.

126.     It is also believed that Sheriff Soyez was instrumental in persuading his employee, Marion Mayor David Mayfield, to hire Cody to the Chief position.

127.     Having formed a new alliance in Marion, and with both Soyez and Cody harboring animus toward the *Record*, including Ms. Gruver, the two top law enforcement officials were primed to act aggressively when Eric Meyer sent his Friday, August 4 e-mail to the two of them, notifying them of the KDOR record issue.

128.     Notably, City Administrator Brogan Jones – who was also forwarded the KDOR record information from Vice-Mayor Herbel – immediately took the position that the KDOR record was a state oversight issue, and the Marion Police Department would not be looking into the matter.

129.     On Monday, August 7, Mayor Mayfield overruled City Administrator Jones and directed Chief Cody to begin an investigation into Vice-Mayor Herbel and the *Record.*

130.    Later that evening, Kari Newell appeared before the meeting of the Marion City Council in conjunction with her efforts to obtain a catering license for her new restaurant, Chef's Plate, since the license was still held at that time by County Attorney Ensey's sister-in-law, Tammy Ensey.

131.    At the City Council meeting, Newell lashed out about the allegedly illegal access to her KDOR record, having now been told by Chief Cody that someone at the *Record* had stolen her identity.

132.    Newell said she was going to "place this with the County Attorney."  "This is going to become a case," she threatened.

133.    The next day, Tuesday, August 8 – the same day Chief Cody sent his "Crimes?" e-mail to County Attorney Ensey – Cody met with Sheriff Soyez, who agreed to join in the investigation against the *Record.*

134.    Cody and Soyez then met with Sheriff's Detective Aaron Christner, whom Soyez had involved in the investigation to help out with the technical details.

135.    Detective Christner advised Cody and Soyez not to serve a preservation warrant on the *Record's* internet provider and to jump straight to the search warrant.

136.    Detective Christner then began drafting the *Application.*  When completed, he sent it on to Chief Cody so that Cody could edit and sign it in his own name, and with his own professional background included.

137.    On Thursday, August 10, Cody and Soyez discussed the draft *Affidavits*, including those for Herbel and Maag, and Soyez suggested adding a fourth warrant for Eric Meyer's home.

138.    Also on August 10, Cody sent Soyez a text at 7:04 a.m., stating "Guess what I found?"

139.   After Soyez responded, "What?", Cody stated "Eric admits in the news article that they downloaded the information."

140.   After receiving Chief Cody's final drafts of the *Affidavits*, Detective Christner – at Sheriff Soyez's continued direction – drafted the actual *Warrants* to be submitted to the Magistrate Judge for signature.

141.   Once the *Applications* and *Warrants* were finalized, they were presented to Magistrate Judge Viar for signature by a representative of County Attorney Ensey's office the morning of Friday, August 11, 2023.  The *Record*, Herbel and Eric Meyer warrants were signed; the Pam Maag warrant was rejected.

142.   Sheriff Soyez supplied Sheriff's Detectives Christner and Steven Janzen to Cody to assist with the raid of the *Record's* offices.

143.   While Chief Cody was inside the *Record's* offices with the raids underway, Cody called Soyez to bring him up to speed and obtain additional directions.

144.   When the raids had all been completed, Cody drove to the Sheriff's Office to debrief on the day's events and partake in a celebratory pizza party, which Soyez had arranged.

145.   In fact, Soyez was anxious to get the pizza party started before the raids were even concluded, texting Chief Cody at 1:03 p.m., "If you want to start freeing people up when you can the food is here."

146.   During the pizza party, Chief Cody related to Soyez that it "made my day" to yank the cell phone out of Ms. Gruver's hand – the second time, at least, that he had bragged about it that day (the first being toward the tail end of his phone call with Kari Newell).

147.   Sheriff Soyez strategized with Chief Cody about the investigation into the *Record*, supplied a Sheriff's Detective to draft the *Applications* and *Warrants*, suggested an additional

target (Eric Meyer's home), supplied two Sheriff's Deputies for the raid on the *Record's* offices, strategized with Chief Cody during the raids, and hosted a celebratory party when the raids had concluded.

148.    Sheriff Soyez's substantive involvement in the investigation and the raids, from start to finish, contributed to place Chief Cody at the back doorstep of the *Record's* offices on August 11.

## THE PARTIES, JURISDICTION & VENUE

Plaintiff hereby adopts by reference paragraphs one through one hundred forty-eight (1-148) inclusive, and, in addition, further states and alleges:

149.    Plaintiff, DEB GRUVER ("plaintiff Gruver" or "Ms. Gruver") is an adult individual and a citizen of Kansas, residing in Wichita, Sedgwick County.

150.    Defendant, FORMER CHIEF GIDEON CODY, MARION, KANSAS POLICE DEPARTMENT ("Chief Cody," "Cody," "Former Chief Cody" or "defendant Cody"), was at all times relevant herein the Chief of the Marion, Kansas Police Department.  Former Chief Cody is being sued in his individual capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims.  Former Chief Cody is upon information presently a citizen of the State of Hawaii.  Former Chief Cody may be served with process personally or through his counsel of record.

151.    Defendant, MARION COUNTY ATTORNEY JOEL ENSEY ("County Attorney Ensey") is and was at all times relevant herein the duly elected County Attorney of Marion County, Kansas.  County Attorney Ensey is being sued in his individual capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims.  County Attorney Ensey is a citizen of the State of Kansas.  County Attorney Ensey may be served with process personally or through other lawful means.

152.    Defendant, MARION COUNTY SHERIFF JEFF SOYEZ ("Sheriff Soyez," "Soyez," or "defendant Soyez"), is and was at all times relevant herein the Sheriff of Marion County, Kansas.  Sheriff Soyez is being sued in his individual capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims.  Sheriff Soyez is a citizen of the State of Kansas.  Sheriff Soyez may be served with process personally or through other lawful means.

153.    Jurisdiction of this action is conferred by 28 U.S.C. § 1331, which provides original "federal question" jurisdiction over all civil actions arising under the United States Constitution and laws or treaties of the United States.  Jurisdiction is further conferred by 28 U.S.C. § 1343(a)(3), which provides for original jurisdiction in suits authorized by 42 U.S.C. § 1983.

154.    Plaintiff Gruver's claims for damages herein are authorized by: (1) 42 U.S.C. § 1983, which provides for redress for the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States; (2) the First Amendment of the United States Constitution, which protects freedom of speech and the press; (3) the Fourth Amendment of the United States Constitution, which protects the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; and (4) 42 U.S.C. § 1988, which allows the prevailing party to collect a reasonable attorney's fee as costs in any action or proceeding to enforce 42 U.S.C. § 1983.

155.    Venue is proper in the U.S. District Court for the District of Kansas under 28 U.S.C. § 1391(b)(1) & (2), as the events giving rise to plaintiff Gruver's claims occurred in Marion, Kansas.

156.    This Court has personal jurisdiction over each defendant.

157.    This action asserts no claims under the Kansas Tort Claims Act and thus the notice provisions of K.S.A. 12-105b(d) are inapplicable.

**FIRST COUNT:** *Violation of Plaintiff Gruver's Rights under the First Amendment of the United States Constitution & 42 U.S.C. § 1983 – Defendants Cody & Soyez*

Plaintiff hereby adopts by reference paragraphs one through one hundred fifty-seven (1-157) inclusive, and, in addition, further states and alleges:

158.    Under 42 U.S.C. § 1983, a person may recover damages for a deprivation of his or her constitutionally protected rights when that injury is inflicted under color of state law.  Chief Cody acted in his individual capacity as Chief of the Marion, Kansas Police Department under color of state law when he signed an unreasonable and unlawful *Application for Search Warrant* and executed on an unreasonable and unlawful *Search Warrant* on August 11, 2023.

159.    The *Application* and *Warrant* were facially invalid in that they contended a search on a public-facing governmental website was illegal and contradicted the federal and/or state laws protecting journalists from search and seizure of journalistic materials.

160.    Further, the *Application* and *Warrant* were facially invalid in that no probable cause existed to support that crimes under K.S.A. 21-6107 – Identity Theft, or K.S.A. 21-5839 – Unlawful Acts Concerning Computers, or any other crime, had been violated.

161.    The *Application* and *Warrant* were substantively invalid as existing evidence did not establish a legally sufficient nexus between the alleged crime and the places searched or the items seized.

162.    In executing on the unreasonable and unlawful *Search Warrant*, Chief Cody exceeded the scope of the warrant by seizing Ms. Gruver's personal cellular phone from her person, while she was physically located outside the premises covered by the warrant, despite the fact that neither Ms. Gruver nor her personal cellular phone were referenced anywhere in the

*Application* or *Warrant*, there was no evidence to suggest that the seized property was evidence of a crime, there was no evidence to establish that the personal cellular phone had been used to access the Kansas Department of Revenue records website, the scope of the warrant only authorized at most a preview to exclude the personal cellular phone from seizure, and Kansas law established that a person's mere nearness to others independently suspected of criminal activity does not, without more evidence, give rise to probable cause to search that person.

163.    In seizing Ms. Gruver's personal cellular phone despite the seizure exceeding the scope of the unreasonable and unlawful search warrant, Chief Cody acted in unreasonable and unnecessarily violent fashion, causing injury to plaintiff's Gruver's rights and her person.

164.    Such acts were done by Chief Cody in retaliation for Ms. Gruver exercising her protected rights under the First Amendment of the United States Constitution as a reporter for the *Record*, which protects freedom of speech and freedom of the press.

165.    Upon belief, Ms. Gruver's affiliation with the *Marion County Record*, which had investigated his alleged prior acts of misconduct and recently published the story about Ms. Newell's prior driving history, sparked Chief Cody's desire for retaliation against her personally, in violation of her First Amendment rights.

166.    Defendant Cody is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights.  Because his actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, he may be subjected to punitive damages.

167.    Chief Cody's unlawful and unreasonable *Applications, Warrants*, searches and seizures at the homes of Eric & Joan Meyer and Ruth Herbel are further evidence of his malicious intent.

168.    Sheriff Soyez is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights under the allegations set out in ¶154-163, as Chief Cody could not have obtained a *Warrant* for the *Record's* offices without the ongoing, substantive involvement of Sheriff Soyez throughout each and every step of the investigative process, including Sheriff Soyez's acts in strategizing with Chief Cody about the investigation, directing his Sheriff's Detective to participate in the investigation, draft the *Applications* and *Warrants* and assist with the raid, directing a second Sheriff's Detective to participate in the raid, consulting with and providing Chief Cody direction during the raid and supporting and encouraging the investigation and the raids throughout every stage in the process.

169.    Sheriff Soyez's acts were done in retaliation for Ms. Gruver exercising her protected and clearly established rights under the First Amendment of the United States Constitution as a reporter for the *Record*, which protects freedom of speech and freedom of the press.

170.    Sheriff Soyez's actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, and he may be subjected to punitive damages.

171.    Ms. Gruver's rights under the First Amendment to the United States Constitution were clearly established at the time of the events at issue.

172.    As a direct and proximate result of defendants Cody & Soyez's conduct violating Ms. Gruver's constitutional rights, plaintiff Gruver has sustained damages, including, but not limited to, emotional distress, mental anguish and physical injury.  Defendants Cody and Soyez's malicious and recklessly indifferent acts justify an award of punitive damages.

**SECOND COUNT:** *Violation of Plaintiff Gruver's Rights under the Fourth Amendment of the United States Constitution & 42 U.S.C. § 1983 – Defendants Cody, Soyez & Ensey*

Plaintiff hereby adopts by reference paragraphs one through one hundred seventy-two (1-172) inclusive, and, in addition, further states and alleges:

173.    Under 42 U.S.C. § 1983, a person may recover damages for a deprivation of his or her constitutionally protected rights when that injury is inflicted under color of state law.  Chief Cody acted in his individual capacity as Chief of the Marion, Kansas Police Department under color of state law when he signed an unreasonable and unlawful *Application for Search Warrant* and executed on an unreasonable and unlawful *Search Warrant* on August 11, 2023.

174.    The *Application* was facially invalid in that it contended a search on a public-facing governmental website was illegal and contradicted the federal and/or state laws protecting journalists from search and seizure of journalistic materials.

175.    Further, the *Application* and *Warrant* were facially invalid in that no probable cause existed to support that crimes under K.S.A. 21-6107 – Identity Theft, or K.S.A. 21-5839 – Unlawful Acts Concerning Computers, or any other crime, had been violated.

176.    The *Application* and *Warrant* were substantively invalid as existing evidence did not establish a legally sufficient nexus between the alleged crime and the places searched or the items seized.

177.    In executing on the unreasonable and unlawful *Search Warrant*, Chief Cody exceeded the scope of the warrant by seizing Ms. Gruver's personal cellular phone from her person, while she was physically located outside the premises covered by the warrant, despite the fact that neither Ms. Gruver nor her personal cellular phone were referenced anywhere in the *Application* or *Warrant*, there was no evidence to suggest that the seized property was evidence of a crime, there was no evidence to establish that the personal cellular phone had been used to access

the Kansas Department of Revenue records website, the scope of the warrant only authorized at most a preview to exclude the personal cellular phone from seizure, and Kansas law established that a person's mere nearness to others independently suspected of criminal activity does not, without more evidence, give rise to probable cause to search that person.

178.    In seizing Ms. Gruver's personal cellular phone despite the seizure exceeding the scope of the unreasonable and unlawful search warrant, Chief Cody acted in unreasonable and unnecessarily violent fashion, causing injury to plaintiff's Gruver's rights and her person.

179.    Such acts were done by Chief Cody in violation of Ms. Gruver's protected rights under the Fourth Amendment of the United States Constitution, which protects citizens from unreasonable and unlawful searches and seizures.

180.    No reasonable officer in Chief Cody's position would have believed the seizure of Ms. Gruver's personal cellular phone constitutionally complied with the Fourth Amendment of the United States Constitution.

181.    Defendant Cody is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights.  Because his action was malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, he may be subjected to punitive damages.

182.    Chief Cody's unlawful and unreasonable *Applications, Warrants*, searches and seizures at the homes of Eric & Joan Meyer and Ruth Herbel are further evidence of his malicious intent.

183.    Sheriff Soyez is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights under the allegations set out in ¶169-178, as Chief Cody could not have obtained a *Warrant* for the *Record's* offices without the ongoing, substantive involvement of Sheriff Soyez throughout each and every step of the investigative process, including Sheriff

Soyez's acts in strategizing with Chief Cody about the investigation, directing his Sheriff's Detective to participate in the investigation, draft the *Applications* and *Warrants* and assist with the raid, directing a second Sheriff's Detective to participate in the raid, consulting with and providing direction to Chief Cody during the raid and supporting and encouraging the investigation and the raids throughout every stage in the process.

184.   Sheriff Soyez's actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, and he may be subjected to punitive damages.

185.   County Attorney Ensey is also liable in his individual capacity for his conduct violating Ms. Gruver's clearly established rights under the Fourth Amendment of the United States Constitution.

186.   A reasonable prosecutor, once apprised of Chief Cody's investigation and his allegations in his August 8 "Crimes?" e-mail, would have known that no probable cause existed to support that any law had been violated, including any law over which his office may have had jurisdiction to present charges against any individual.

187.   A reasonable prosecutor would have known that the *Application* failed to establish probable cause to support that any law had been violated, including K.S.A. 21-6107 – Identity Theft, or K.S.A. 21-5839 – Unlawful Acts Concerning Computers.

188.   County Attorney Ensey conceded there was no probable cause to believe any crime had been violated in his Press Release of August 16, except K.S.A. 21-5839 – Unlawful Acts Concerning Computers.

189.   But the inclusion of Eric Meyer's August 4 e-mail in Chief Cody's August 8 "Crimes?" memo to County Attorney Ensey clearly vitiated any intent or *mens rea* to commit any crime, including any crime which could be charged under K.S.A. 21-5839.

190.    A reasonable prosecutor would have known that the *Application* and *Warrant* failed to establish a legally sufficient nexus between the alleged crime and the places to be searched and the items to be seized.

191.    County Attorney Ensey conceded that the *Warrant* was illegal and overbroad on August 16, 2023.

192.    County Attorney Ensey reviewed the *Applications* on August 10 or 11, 2023, and then instructed his office to present the *Applications* and the overbroad and illegal *Warrants* to the Magistrate Judge for approval.

193.    Even if County Attorney Ensey's claim that he did not "fully review" the *Affidavits* or *Warrants* were true, even a cursory reading of the papers would reveal the intended places to be searched, leading a reasonable prosecutor to conclude what County Attorney Ensey has already conceded: that there was no legally sufficient nexus between the alleged crime and the places to be searched.

194.    Prior to reviewing and directing that the overbroad and illegal *Warrants* be delivered to the Magistrate Judge for approval, County Attorney Ensey participated in the ongoing investigation into the *Record,* per the e-mails and text messages from Chief Cody and the allegations in Former Chief Cody's *Answer.*

195.    The collective evidence supports that County Attorney Ensey was substantively involved in both the investigative phase and the administrative phase of the investigation which contributed to the issuance of the *Warrant* that brought Chief Cody to the back doorstep of the *Record's* offices on August 11.

196.     County Attorney Ensey set in motion a series of events that he knew or reasonably should have known would cause others, including Chief Cody, to deprive *Record* employees, including Ms. Gruver, of their constitutional rights.

197.     Ms. Gruver's rights under the Fourth Amendment of the United States Constitution were clearly established at the time of the events at issue.

198.     As a direct and proximate result of defendants Cody, Soyez & Ensey's conduct violating Ms. Gruver's constitutional rights, plaintiff Gruver has sustained damages, including, but not limited to, emotional distress, mental anguish and physical injury.

199.     Defendants Cody & Soyez's malicious and recklessly indifferent acts justify an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DEBBIE K. "DEB" GRUVER prays for damages against the defendants, individually and jointly, as follows: (1) compensatory damages in excess of $75,000.00, exclusive of interest and costs; and (2) costs, expenses and reasonable attorney's fees pursuant to K.S.A. 42 U.S.C. § 1988.  Plaintiff also claims punitive damages against defendants Cody & Soyez.  Plaintiff further requests any other relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff DEBBIE K. "DEB" GRUVER hereby demands a trial by jury.  Plaintiff filed a Designation of Place of Trial contemporaneous to the filing of her original Complaint, designating Wichita, Kansas as the Place of Trial.

Respectfully submitted,

HUTTON & HUTTON

*/s/ Blake A. Shuart, #24463*
Blake A. Shuart, #24463
Andrew W. Hutton, #10264
J. Darin Hayes, #16755
Matthew M. Dwyer, #22492
Kaylea D. Knappenberger, #28902
8100 E. 22nd St. N., Bldg. 1200
Wichita, KS  67226
Phone: (316) 688-1166
Fax: (316) 686-1077
E-Mail: Blake.Shuart@huttonlaw.com
*Attorneys for Plaintiff*