# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DEBBIE K. GRUVER,**

**Plaintiff**,

**v.**

**JEFF SOYEZ, in his individual capacity, and JOEL ENSEY, in his individual capacity,**

**Defendants**.

Case No. 23-1179-DDC-GEB

## MEMORANDUM AND ORDER

This case is one of many suits arising out from unlawful police raids of the *Marion County Record*, a small-town Kansas newspaper. Plaintiff Debbie K. Gruver, a reporter for the *Record*, sued three defendants. One defendant, former Marion Chief of Police Gideon Cody, left the case by stipulation of the parties. Doc. 45. The two remaining defendants are Marion County Sheriff Jeff Soyez and Marion County District Attorney Joel Ensey. Plaintiff alleges that defendants violated her First and Fourth Amendment rights, and now seeks to recover damages under 42 U.S.C. § 1983. But plaintiff wasn't the main target of the allegedly unconstitutional conduct. And defendants here occupied a peripheral role in the challenged conduct. The court concludes that these defendants aren't liable to this plaintiff on the claims she brings. And so, the court grants defendants' Motion to Dismiss (Doc. 58). The court explains its reasoning, below. First, it recites the allegations in plaintiff's operative pleading and the legal standard governing the Motion to Dismiss.

I.        **Background**

The following facts come from plaintiff's Second Amended Complaint (Doc. 56).  The court accepts plaintiff's "well-pleaded facts as true, view[s] them in the light most favorable to Plaintiff[], and draw[s] all reasonable inferences from facts in favor of Plaintiff[]."  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citation omitted).

### Setting the Scene

Marion is a town in Kansas with a population of about 1,900.  Doc. 56 at 1 (2nd Am. Compl. ¶ 1).  Plaintiff "is an award-winning journalist" who works for the *Marion County Record*, a weekly newspaper based in Marion.  *Id.* at 3 (2nd Am. Compl. ¶ 7).

In April 2023, the *Record* learned that Marion Mayor David Mayfield had offered Gideon Cody a job as the new police chief for the Marion Police Department.  *Id.* at 4 (2nd Am. Compl. ¶ 14).  Gideon Cody previously had served as a captain for the Kansas City, Missouri Police Department.  *Id.*  The *Record* began investigating Cody and received information about Cody from anonymous tipsters.  *Id.* (2nd Am. Compl. ¶ 15).  Cody learned about this activity and knew that plaintiff was the person responsible for investigating him.  *Id.* (2nd Am. Compl. ¶ 18).

Cody was instrumental in the August 2023 raids on the *Record* prompting this lawsuit. *Id.* (2nd Am. Comp. ¶ 59).  And, according to plaintiff, Marion County District Attorney and Marion County Sheriff Soyez—defendants here—helped Cody.  *See id.* at 15–21 (2nd Am. Compl. ¶¶ 86–118) (alleging Ensey's involvement); *id.* at 21–24 (2nd Am. Compl. ¶¶ 119–43) (alleging Soyez's involvement).  A full understanding of their alleged involvement requires something of a detour to explain.  The court thus recites the sequence of events leading up to the search warrant and raid at issue here.

### Lead Up to Warrant

At the beginning of August 2023, two other *Record*-affiliated individuals had a tense interaction with a Marion resident. *Id.* at 5 (2nd Am. Compl. ¶ 21). Eric Meyer, co-owner and publisher of the *Record*, and Phyllis Zorn, a reporter for the *Record*, tried to attend an event hosted at a coffeeshop owned by Marion resident Kari Newell. *Id.* But Newell required the two to leave the based on her belief that the *Record* "has a long-standing reputation for twisting and contorting comments within our community." *Id.* (2nd Am. Compl. ¶ 21).

After the coffeeshop event, local resident Pam Maag sent Zorn a screenshot, which contained information about Newell's suspended driver's license. *See id.* at 6 (2nd Am. Compl. ¶ 28). Zorn confirmed the accuracy of the information on a website operated by the Kansas Department of Revenue (KDOR). *Id.* (2nd Am. Compl. ¶ 29). This website included information permitting one to verify information about the status of an individual's driver's license. *See id.* (2nd Am. Compl. ¶¶ 28–30). The *Record* decided not to publish a story about Newell's suspended driver's license status. *Id.* (2nd Am. Compl. ¶ 27).

Instead, the *Record* notified Chief Cody and defendant Soyez, the Sheriff of Marion County. *Id.* (2nd Am. Compl. ¶ 32). The *Record* explained that the tipster (Maag) had alleged to the *Record* that local law enforcement officials knew that Newell didn't have a valid driver's license, and they had ignored repeated traffic violations by Newell. *Id.* Newell then complained to the Marion City Council that the *Record* had "illegally obtain[ed] drunken-driving information about her[.]" *Id.* at 5 (2nd Am. Compl. ¶ 24).

### Warrant Application

Several days after Newell complained to the Marion City Council, District Attorney Ensey's staff presented an application for a search warrant to Magistrate Judge Laura Viar. *Id.* at 7 (2nd Am. Compl. ¶ 37). The search warrant application sought to search the office of the

3

*Record.*  *Id.* (2nd Am. Compl. ¶ 38); Doc. 59-1 at 1 (search warrant application).[1]  The search

warrant application alleges probable cause for the violation of two state law crimes:  identity

theft and unlawful acts concerning computers.  Doc. 56 at 8 (2nd Am. Compl. ¶ 41); Doc. 59-1 at

1.  The warrant application alleges that downloading records from the KDOR website requires

the user either to impersonate a victim or lie about the user's reason for accessing the records.

Doc. 56 at 8 (2nd Am. Compl. ¶¶ 45–46); Doc. 59-1 at 6.

Magistrate Judge Viar approved the application and issued the warrant on the morning of

August 11, 2023.  Doc. 56 at 9 (2nd Am. Compl. ¶ 55).  The warrant restricted search access to

internet devices that "have been used to access the Kansas Department of Revenue records

website."  *Id.* (2nd Am. Compl. ¶¶ 52–53).  The warrant also required officers to perform a

"preview search . . . to exclude from seizure those [devices] which have not been involved in the

identity theft[.]"  *Id.* (2nd Am. Compl. ¶ 54).

Chief Cody—joined by other officers—went to the *Record*'s offices to execute the

warrant.  *Id.* at 10 (2nd Am. Compl. ¶ 60).  When he arrived, Cody approached plaintiff, who

was sitting outside the *Record*'s office.  *Id.* at 11 (2nd Am. Compl. ¶ 61).  Cody handed plaintiff

a copy of the warrant and demanded her cell phone.  *Id.* (2nd Am. Compl. ¶¶ 62–66).  When

plaintiff explained that she needed to call Meyer, her paper's publisher, Cody "violently

snatch[ed] the phone" out of plaintiff's hand.  *Id.* (2nd Am. Compl. ¶¶ 65–66).  Cody directed

---

[1]         The court properly may consider the search warrant and application attached to defendants'
motion because they're "'referred to in the complaint[,]'" "'central to the plaintiff's claim and the parties
do not dispute the documents' authenticity.'"  *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1150
n.11 (10th Cir. 2023) (quoting *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)).  But this rule does
not permit the court to consider the exhibit—the special prosecutor's report on the raids, Doc. 60-1—that
plaintiff attached to her Response brief.  *See Erikson v. BP Expl. & Prod. Inc.*, 567 F. App'x 637, 639
(10th Cir. 2014) (holding district court didn't err when it declined to "consider the materials [plaintiff]
attached to his response" to motion to dismiss); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under
Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the
motion must be treated as one for summary judgment under Rule 56.").

officers to remove equipment from the *Record*'s offices, including plaintiff's workplace computer, other employees' computers, and employees' cell phones. *Id.* at 12 (2nd Am. Compl. ¶ 69).

During the raid—which lasted for more than three hours—Marion Police Officer Zach Hudlin went through plaintiff's personal work files and instructed Cody to look at the file plaintiff had kept about Cody. *Id.* (2nd Am. Compl. ¶¶ 70–72). Cody looked at this file. *Id.* (2nd Am. Compl. ¶ 73).

### *Aftermath*

The raid on the *Record* drew international attention. *Id.* at 13 (2nd Am. Compl. ¶ 76). Several days after the raids, defendant District Attorney Ensey announced that he was withdrawing the warrants and had asked a court to return the seized evidence. *Id.* at 14 (2nd Am. Compl. ¶ 81). In his press release, Ensey expressed his conclusion that "insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized." *Id.* (2nd Am. Compl. ¶ 82).

The Second Amended Complaint contains sections that explain the involvement of the two remaining defendants in greater detail. Following plaintiff's lead, the court next explains additional pertinent allegations about Ensey and Soyez.

### *District Attorney Ensey*

On August 7, 2023, several days before the warrant issued, Cody explained to Ensey in a text that Newell wished to pursue criminal charges. *Id.* at 15–16 (2nd Am. Compl. ¶ 90). The next day, August 8, Cody sent Ensey an email outlining a series of theories about laws that the *Record* and its employees potentially had violated. *Id.* at 16 (2nd Am. Compl. ¶ 91). At some point during that same day, Cody met with Ensey, "who gave his approval to move forward with the investigation." *Id.* at 15 (2nd Am. Compl. ¶ 88). The following day, August 9, Ensey ran

into a Kansas Bureau of Investigation (KBI) agent at the Marion County courthouse. *Id.* at 17 (2nd Am. Compl. ¶ 96). Ensey's conversation with the agent led him to believe that the KBI was taking over the case and that the KBI would pursue the necessary search warrants. *Id.* (2nd Am. Compl. ¶¶ 96–97).

Still, Chief Cody emailed a warrant application and warrant draft to Ensey on August 10. *Id.* (2nd Am. Compl. ¶ 98). In a memo to himself, Ensey acknowledged receiving these materials and opening them, but he claimed that he hadn't reviewed them fully. *Id.* (2nd Am. Compl. ¶ 99). On Friday, August 11, Ensey's office manager reported to him that Cody had called and had officers waiting to execute the warrants. *Id.* at 17–18 (2nd Am. Compl. ¶ 101). Ensey then directed his office manager to print the warrant application and warrant draft and "let the judge decide." *Id.* at 18, 19 (2nd Am. Compl. ¶¶ 101, 106).

After the raids, District Attorney Ensey communicated with his counterpart in Sedgwick County, District Attorney Marc Bennett. *Id.* at 19–20 (2nd Am. Compl. ¶¶ 110–11). Bennett discussed that possibly Ensey could face liability for his involvement and suggested that Ensey return the seized items to their owners quickly. *Id.* at 20 (2nd Am. Compl. ¶¶ 111–14). Ensey issued a press release on August 16 and expressed his belief that the warrant affidavit had established probable cause to believe that a *Record* employee had violated Kansas law. *Id.* at 21 (2nd Am. Compl. ¶ 116). Still, Ensey ordered the seized items released, concluding that "insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized." *Id.* (2nd Am. Compl. ¶ 117).

### *Sheriff Soyez*

Defendant Jeff Soyez, Marion County's Sheriff, had served as the Marion County Sheriff since 2022. *Id.* at 21 (2nd Am. Compl. ¶ 120). Soyez knew Cody and was instrumental in persuading Mayor Mayfield to hire Cody. *Id.* (2nd Am. Compl. ¶¶ 119, 121). Soyez and Cody

"harbor[ed] animus toward the *Record*," including plaintiff, one of its reporters. *Id.* at 22 (2nd Am. Compl. ¶ 122). After Mayor Mayfield overruled the City Administrator's decision not to review the status of Newell's driver's license, Soyez "agreed to join in the investigation against the *Record*." *Id.* (2nd Am. Compl. ¶¶ 124, 128). Soyez then recruited Sheriff's Detective Aaron Christner to help "with the technical details" of the investigation. *Id.* at 23 (2nd Am. Compl. ¶ 129). Soyez also directed Christner to draft the actual warrants for submission to the magistrate. *Id.* (2nd Am. Compl. ¶ 135). Soyez "supplied" two of his detectives "to Cody to assist with the raid[.]" *Id.* at 24 (2nd Am. Compl. ¶ 137). During the raid, Cody called Soyez "to bring him up to speed" and get "additional directions." *Id.* (2nd Am. Compl. ¶ 138). Soyez hosted a pizza party for the officers after the raid. *Id.* (2nd Am. Compl. ¶¶ 139–40, 142).

Plaintiff's lawsuit asserts two claims: a § 1983 First Amendment claim against Soyez and a § 1983 Fourth Amendment claim against Soyez and Ensey. *Id.* at 26–27 (2nd Am. Compl. ¶¶ 152–60); *id.* at 27–33 (2nd Am. Compl. ¶¶ 161–89).

## II.  Legal Standard

Under Rule 12(b)(6), a party may move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir.

2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).  The Tenth Circuit has explained that "[t]here is a 'low bar for surviving a motion to dismiss[.]'" *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020)).  "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely[.]'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (quoting *Quintana*, 973 F.3d at 1034).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And, while this pleading standard doesn't require "'detailed factual allegations,'" it demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## III.      Analysis

### A.      Section 1983 and Qualified Immunity Overview

The law on 42 U.S.C. § 1983—under which both Counts arise—and a qualified immunity defense are relevant throughout this Order.  So, the court starts with a brief overview of these topics.

#### 1.  Section 1983

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, "which requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler v. Stitt*, 104 F.4th 770, 797 (10th Cir. 2024) (internal quotation marks and citation omitted).  A

plaintiff may assert a § 1983 claim against either a municipality or an individual. *See Brown*, 124 F.4th at 1264 (permitting § 1983 suit for policies and practices of municipal police department), *id.* at 1266 (permitting § 1983 suit against police chief in his individual capacity). As a defense against a § 1983 claim, an individual defendant may assert qualified immunity. *Id.* at 1266. But "[q]ualified immunity is not available as a defense to municipal liability." *Pyle v. Woods*, 874 F.3d 1257, 1264 (10th Cir. 2017) (citing *Owen v. City of Independence*, 445 U.S. 622, 637–38 (1980)). The court outlines the broad contours of the qualified immunity defense, next.

### 1. Qualified Immunity

"When a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the [1] defendant[] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time.'" *Brown*, 124 F.4th at 1265 (alterations in original) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008)). That's so because the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant has "asserted the defense of qualified immunity, the burden is on Plaintiffs to establish their right to proceed." *Matthews v. Bergdorf*, 889 F.3d 1136, 1143 (10th Cir. 2018); *Bledsoe v. Carreno*, 53 F.4th 589, 617 n.25 (10th Cir. 2022) ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was [plaintiff's] burden to show both that he had alleged a constitutional violation and that that violation was clearly established."). If plaintiff fails to carry that burden, "'the defendant prevails on the defense'" and the plaintiff's claims "are dismissed." *Losee v.*

*Preece*, No. 18-CV-195-TC, 2022 WL 957194, at *5 (D. Utah Mar. 30, 2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A constitutional right is clearly established when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.  In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citations omitted).  A plaintiff can't defeat qualified immunity "simply by alleging violation of extremely abstract rights," *White v. Pauly*, 580 U.S. 73, 79 (2017), and a court shouldn't "define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

"Ordinarily, to make such a showing of clearly established law in our circuit, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quotation cleaned up).  But such authority is unnecessary and "a government official may still have notice that their conduct violates a constitutional right" when "it is so apparent as to apply with obvious clarity." *Brown*, 124 F.4th at 1265.  "In this regard, the Supreme Court has reminded us recently that under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." *Frasier*, 992 F.3d at 1015 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)); *see also Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) ("The degree of specificity required from prior case law depends in part on the character of the challenged

conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").

### B.    District Attorney Ensey

The court dismisses plaintiff's claim against District Attorney Ensey. Ensey argues that he didn't cause plaintiff's injuries, that her injuries weren't foreseeable, and that he's entitled to qualified immunity. Doc. 59 at 10–15. The court finds that Ensey's entitled to qualified immunity because, as alleged, Ensey didn't violate clearly established law. The court thus needn't consider Ensey's causation and foreseeability arguments. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Drawing all reasonable inferences in plaintiff's favor, the court accepts as true plaintiff's allegations that Ensey reviewed and approved the search warrant application and draft warrant. *See* Doc. 56 at 17, 31–32 (2nd Am. Compl. ¶¶ 99, 181–85). Even so, plaintiff's claim can overcome Ensey's assertion of qualified immunity only if "in light of clearly established law . . . [Ensey] could not reasonably have concluded that the warrant affidavit established probable cause." *Eckert v. Dougherty*, 658 F. App'x 401, 407 (10th Cir. 2016); *see also Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc) ("[T]he defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed[.]"). Our Circuit also has characterized this inquiry as asking whether "there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quotation cleaned up).

Here, Ensey argues that arguable probable cause supported the warrant. Doc. 59 at 14–

15. And the court agrees. Even if the warrant application shouldn't have passed muster, "it was

not so obviously lacking in probable cause that the [district attorney] can be considered 'plainly

incompetent' for concluding otherwise." *Messerschmidt v. Millender*, 565 U.S. 535, 556 (2012).

Here are the key allegations contained in the search warrant application[2]:

- Newell did not download or authorize anyone else to download any information from the KDOR's website. Doc. 59-1 at 7.

- Eric Meyer had contacted Newell, told her that Phyllis Zorn had downloaded the "private" information from the KDOR website, and threatened Newell that he would print a story about her license if she "pursue[d] anything[.]" *Id.*

- Downloading Newell's documents from the KDOR website required a user to select one of 13 options. *Id.* at 6–7. The user must agree to a declaration that says, "I am eligible and have the express authority to receive the requested information pursuant to the Federal Drivers' Privacy Protection Act of 1994, as amended." *Id.* at 8.

- "Downloading the document" from the KDOR website "involved either *impersonating* the victim or *lying* about the reasons why the record was being sought." *Id.* at 6 (emphasis added).

These allegations establish arguable probable cause that Eric Meyer, Phyllis Zorn, or

another employee of the *Record* had committed a crime. Specifically, under the facts asserted by

the search warrant application, Ensey could "reasonably have concluded that the warrant

affidavit established probable cause" that someone associated with the *Record* had violated a

Kansas statute prohibiting unauthorized access of a computer system. *Eckert*, 658 F. App'x at

407. That statute, Kan. Stat. Ann. § 21-5839(a), makes it unlawful for "any person to: . . . (5)

knowingly and without authorization, access or attempt to access any computer, computer

---

[2]    Ensey could rely reasonably on the factual assertions made by the warrant's application. As our Circuit has explained, officers may rely on the "'observations, statements, and conclusions of their fellow officers[.]'" *Eckert*, 658 F. App'x at 407 (quoting *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998)). Also, "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *Id.* (alteration in original) (quoting *United States v. Ventresca*, 380 U.S. 102, 111 (1965)).

system, social networking website, computer network or computer software, program, documentation, data or property contained in any computer, computer system or computer network."

From the search warrant application, Ensey reasonably could conclude that someone at the *Record* had violated this statute. That's so because the warrant application established that (1) Phyllis Zorn had accessed Newell's "private" information; (2) she did so without Newell's authorization; and (3) she either "impersonat[ed]" or "l[ied]" to do so. Doc. 59-1 at 6–7. These allegations—on which Ensey reasonably could rely, *see Eckert*, 658 F. App'x at 407—support a reasonable conclusion that Zorn—collaborating with Meyer and as part of their work for the *Record*—violated Kan. Stat. Ann. § 21-5839(a)(5). They suggest that someone accessed a "computer system" and did so "knowingly and without authorization[,]" which is all that the statute requires. *Id.* Given these allegations, Ensey reasonably could conclude there was a "'fair probability'" that "'evidence of a crime'" was located in the *Record*'s office. *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011) (quoting *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001)).

Plaintiff fails to offer a persuasive response to this line of reasoning and legal authority.[3] In a footnote, plaintiff asserts that Ensey already has conceded that no reasonable official could have concluded that the warrant should issue. Doc. 60 at 7 n.1 (citing Doc. 56 at 21 (2nd Am. Compl. ¶ 117)). The court disagrees. Yes, District Attorney Ensey allegedly issued a press release, stating that "insufficient evidence exist[ed] to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized." Doc. 56 at 21 (2nd

---

[3]    Recall that it is plaintiff's burden—once Ensey asserted a qualified immunity defense—to show that any alleged constitutional violation "was clearly established." *Bledsoe*, 53 F.4th at 617 n.25. When plaintiff doesn't shoulder that burden, the defendant "prevails on the defense." *A.M.*, 830 F.3d at 1135.

Am. Compl. ¶ 117). But this recognition is far from a concession that *no reasonable official* could have concluded that the warrant application supported probable cause. The release takes issue with the nexus and the items actually seized—not whether an alleged crime supported a warrant. In fact, Ensey's press release also maintained that the warrant application *did* establish probable cause that a *Record* employee had committed a crime. *Id.* (2nd Am. Compl. ¶ 116).

Plaintiff relies on *Mink v. Knox*, 613 F.3d 995 (10th Cir. 2010), to explain her theory of liability against Ensey. Doc. 60 at 7–8. But, contrary to plaintiff's argument, *Mink* demonstrates why Ensey *is* entitled to qualified immunity. In *Mink*, a prosecutor reviewed and approved a search warrant for a student's home after the student had published online satirical content about a professor. 613 F.3d at 998–99. Our Circuit concluded that the student's allegations plausibly established that the prosecutor caused a violation of the student's Fourth Amendment rights. *Id.* at 1001–03. And our Circuit rejected the prosecutor's assertion of qualified immunity. *Id.* at 1011–12. But here's the critical distinction between *Mink* and the current case: In *Mink*, no reasonable official could have concluded that the alleged act described in the search warrant was unlawful. 613 F.3d at 1011. That's because our Circuit had expressed—some 20 years before the events in *Mink*—that "parody and rhetorical hyperbole . . . cannot constitute the crime of criminal libel for purposes of a probable cause determination." *Id.* (citing *Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 442 (10th Cir. 1982)). So, the prosecutor's approval of the warrant was unreasonable because binding precedent foreclosed any possibility that the defendant's conduct was criminal. That degree of certainty is absent here. Plaintiff fails to direct the court to *any* case law—let alone binding Tenth Circuit or Supreme Court authority—suggesting that the facts articulated in the search warrant affidavit *couldn't* support probable cause here.

14

More instructive than *Mink* is *Eckert v. Dougherty*, 658 F. App'x 401 (10th Cir. 2016). There, a prosecutor reviewed and approved an affidavit for a warrant to search a man's anal cavity. *Id.* at 404. Our Circuit concluded that the prosecutor deserved qualified immunity. *Id.* at 408. The panel explained that the prosecutor could reasonably rely on an officer's assessment of plaintiff's posture and a drug dog's alert. *Id.* at 407–08. And while it was "a close question, an objectively reasonable official could have concluded that the facts at the time of the request for the search warrant, combined with the reasonable inferences to be drawn therefrom, amounted to probable cause." *Id.* at 408. So too here.

The warrant application's allegations of criminality aren't overwhelming. But neither were they so lacking that *no* reasonable prosecutor could have concluded that they amounted to probable cause. Plaintiff hasn't shouldered her burden to show a clearly established violation of existing law. Ensey thus deserves qualified immunity, and the court dismisses plaintiff's claim against him for that reason.

The court assesses Soyez's motion-to-dismiss arguments, next.

### C.    Sheriff Soyez

The court also dismisses plaintiff's claims against Sheriff Soyez. Soyez argues that plaintiff hasn't alleged adequately that he caused her injuries, or that he acted with the necessary state of mind. Doc. 59 at 8–9. He also argues that plaintiff fails to allege a violation of a clearly established right. *Id.* at 9–10. In short, Soyez asserts a qualified immunity defense and contends he wins the analysis controlling both prongs of the analysis.

Plaintiff hasn't carried her burden at the qualified immunity stage to establish that Soyez himself violated her constitutional rights. In particular, on the first prong, the court concludes that plaintiff has failed to plead either that (1) Soyez caused plaintiff's constitutional injuries or that (2) Soyez acted with the requisite culpability to state a § 1983 claim against him. Because

the same logic plagues both of plaintiff's claims against Soyez—under the First and Fourth Amendments—the court tackles them together.

First, take causation. As already discussed, § 1983 imposes liability on actors acting under state law who "subject[], or cause[] to be subjected" any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation, but personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (quotation cleaned up). More specifically, "'[t]he requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" *Mink*, 613 F.3d at 1001 (quoting *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990)). "Defendants are liable for the harm proximately caused by their conduct." *Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (citation omitted). In other words, a defendant is liable under § 1983 for a constitutional injury if the injury "would not have occurred but for [his] conduct and if there were no unforeseeable intervening acts superseding [his] liability." *Id.* (citation omitted).

Plaintiff's allegations here, as they apply to Sheriff Soyez, can't satisfy our Circuit's causation standards. Here are the allegations against Soyez emphasized by plaintiff in her Response brief:

- Soyez had a longstanding friendship with Cody and helped him win the job as police chief for the Marion Police Department. Doc. 60 at 13 (citing Doc. 56 at 21 (2nd Am. Compl. ¶¶ 119, 121)).

- Soyez, like Cody, harbored animus against the *Record* and its staff. That animus was spurred—in part—by plaintiff's investigation into Cody. *Id.* (citing Doc. 56 at 4, 21 (2nd Am. Compl. ¶¶ 15–18, 121)).

- Soyez met with Cody and "agreed to join the investigation." *Id.* (citing Doc. 56 at 22 (2nd Am. Compl. ¶ 128)).

- Soyez enlisted his deputy, Christner, to assist with technical details and drafting the warrant application. *Id.* (citing Doc. 56 at 23 (2nd Am. Compl. ¶ 129)).

- Soyez directed Christner to draft the requested warrants. *Id.* at 14 (citing Doc. 56 at 23 (2nd Am. Compl. ¶ 135)).

- Soyez "supplied" two of his detectives to help execute the warrants. Cody kept Soyez informed during the raids, and Soyez hosted a pizza party for the officers after the raids were over. *Id.* (citing Doc. 56 at 24 (2nd Am. Compl. ¶¶ 137–41)).

Even viewed in the light most favorable to plaintiff, these allegations can't establish a plausible § 1983 claim against Soyez for violating plaintiff's First and Fourth Amendment rights. Plaintiff hasn't explained how Soyez did anything to cause her constitutional injuries.

Start with the easy issues. Many of the points bulleted above don't causally link to plaintiff's injuries at all. For example, Soyez's post-raid pizza party didn't cause plaintiff's injuries. It happened after the raid. Nor did Soyez's animus toward the *Record*—by itself—cause plaintiff's injuries.

Plaintiff's Response to defendants' motion asserts that had Soyez stayed out of the investigation, Cody would have stayed out as well "for lack of resources, knowledge and influence." Doc. 60 at 14. But the allegations in plaintiff's Second Amended Complaint don't bear out this argument. That is, plaintiff never alleges what indispensable aid Soyez allegedly provided to Cody. Without the help of Soyez and Christner, Cody still could have drafted the warrant application, procured the warrant, and executed the raid. In short, plaintiff hasn't pleaded plausibly that Soyez caused her constitutional injuries. And even if Soyez got involved

somewhere in the causal chain before plaintiff suffered her injuries, plaintiff's allegations never allege that Soyez acted with the requisite culpability.

Our Circuit has enunciated slightly different culpability standards for a § 1983 claim depending on the context. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) ("Precisely what state of mind is required for individual liability depends on the type of claim a plaintiff brings."). In *Mink*, plaintiff alleged that a prosecutor caused his Fourth Amendment injuries by reviewing a warrant affidavit. 613 F.3d at 1002. Our Circuit held that the prosecutor faced liability if she "knew or reasonably should have known" that her actions "would cause others to deprive the plaintiff of her constitutional rights." *Id.* at 1001 (internal quotation marks and citation omitted). What is clear—and what suffices for the current alaysis—is that Soyez must have acted at least negligently to incur § 1983 liability for plaintiff's injuries. *See Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (explaining that supervisory liability requires supervisor to act with "no less than the mens rea required of the subordinates to commit the underlying constitutional violation" (quotation cleaned up)); *see also Mink*, 613 F.3d at 1001 (explaining that defendants are liable under § 1983 if they "knew or reasonably should have known" their conduct would cause deprivation of constitutional rights (internal quotation marks and citation omitted)).

Plaintiff hasn't satisfied her burden to plead that Soyez acted with the requisite mens rea. Take, for instance, Soyez's friendship with Cody. The causal connection between that friendship and plaintiff's injuries is, at best, attenuated. Arguably, if Soyez hadn't helped Cody land the police chief job, Marion wouldn't have hired Cody, and Cody thus wouldn't have been situated in a job where he could have violated plaintiff's rights. But even if that logic were persuasive, there's no allegation that Soyez "knew or reasonably should have known" that his assistance

helping Cody land the job would cause plaintiff's constitutional injuries. *Mink*, 613 F.3d at 1001 (internal quotation marks and citation omitted). Likewise, even if plaintiff could establish that her injuries wouldn't have occurred but for Soyez helping Cody land the police chief job, she hasn't pleaded any facts to support a plausible inference that Soyez "reasonably should have known" his help would cause a violation of plaintiff's rights. *Id.* (internal quotation marks and citation omitted). In other words, plaintiff's constitutional injuries weren't a reasonably foreseeable consequence of Soyez helping Cody secure the job as Marion's police chief. And so, plaintiff hasn't alleged that Soyez possessed the requisite mens rea to incur liability for plaintiff's alleged injuries on this basis.

This same issue—absence of culpability—plagues plaintiff's other accusations against Soyez. Even if Christner's participation was necessary for the warrant to issue and for Cody to execute the raids, plaintiff hasn't pleaded facts capable of supporting a finding or inference that Soyez "knew or reasonably should have known" that Cody or Christner would violate plaintiff's constitutional rights. There's no allegation, for example, that Soyez knew (or should have known) that the warrant lacked probable cause. It's true that the Second Amended Complaint alleges that "Sheriff Soyez's actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights[.]" Doc. 56 at 29 (2nd Am. Compl. ¶ 166). But that assertion is merely a legal conclusion, which the court needn't take as true. *Iqbal*, 556 U.S. at 678.

Nor does plaintiff suggest any alternative basis for liability—such as a conspiracy or failing to intervene. In short, the court concludes that plaintiff's Second Amended Complaint fails to allege plausibly that Soyez was causally responsible for plaintiff's injuries and that he knew or reasonably should have known that his actions would cause plaintiff's injuries. And so, plaintiff fails to shoulder her burden imposed by the qualified immunity defense to "establish

[her] right to proceed." *Matthews*, 889 F.3d at 1143. This shortcoming dooms both of plaintiff's claims against Soyez because Soyez is entitled to qualified immunity. So, the court dismisses both claims.

As discussed, plaintiff can't carry her burden on prong one of the qualified immunity analysis—*i.e.*, "allege facts sufficient to show (assuming they are true) that the [1] defendant plausibly violated [her] constitutional rights[.]" *Brown*, 124 F.4th at 1265 (quotation cleaned up). And even if she could, she can't carry her burden on prong two of the analysis, the one requiring her to identify a clearly established constitutional right. *Id.*[4]

Nothing that Soyez did—having a friendship with Cody, helping Cody land the police chief's job, "joining" the investigation, or lending aid to the investigation—violated clearly established law. Plaintiff cites some clearly established law about principles of the First and Fourth Amendments. Doc. 60 at 8–9. But none of the cited law suggests that Soyez would have notice that *he* was violating clearly established law. For instance, it's not unlawful to share friendships with other law enforcement officers or recommend a friend for employment. Nor is

---

[4]     The court reads Circuit precedent to place both a *pleading* and a *briefing* burden on plaintiffs seeking to survive a qualified immunity defense. That is, a plaintiff must plead facts that plausibly allege a violation of federal law *and* show that the violation was clearly established. *See, e.g., Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006) ("To overcome a qualified immunity defense, a plaintiff must first *establish* a violation of a constitutional or statutory right and then *show* that the right was clearly established." (emphasis added)); *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) ("If the plaintiff *establishes* a violation of a constitutional or statutory right, he must then *demonstrate* that the right at issue was clearly established at the time of the defendant's unlawful conduct." (emphasis added)); *Bledsoe*, 53 F.4th at 617 n.25 ("Appellants are correct that once they asserted qualified immunity in the district court, which they did here, it was Bledsoe's burden to show both that he had *alleged* a constitutional violation and that that violation was clearly established." (emphasis added)); *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (explaining that the plaintiff "bears the ultimate burden of persuasion to overcome qualified immunity" (quotation cleaned up)). Still, the court is cognizant of the Supreme Court's instruction that whether "an asserted federal right was clearly established at a particular time . . . presents a question of law," so a court reviewing qualified immunity should "use its full knowledge of its own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (quotation cleaned up). To that end, the court finds no precedent suggesting that Soyez—as alleged— violated a clearly established constitutional right.

it unlawful to join an investigation or lend department resources to an investigation.  *Cf. Frasier v. Evans*, 992 F.3d 1003, 1025 (10th Cir. 2021) (explaining that proof defendants agreed to "engage in . . . lawful investigative activities" couldn't support a § 1983 claim).  Plaintiff doesn't allege that Soyez was involved in any manner with drafting and procuring the warrant.  Nor does she allege that Soyez executed the warrants or otherwise participated in the investigation in an unlawful manner.

In short, plaintiff hasn't carried her burden on either part of the qualified immunity analysis against Soyez.  The court thus concludes that plaintiff hasn't stated a plausible constitutional violation against Soyez and that Soyez didn't violate a clearly established constitutional right.  So, Soyez deserves qualified immunity.

### D.    Motion to File a Supplemental Response and Motion to Strike

After briefing on defendants' Motions to Dismiss was complete, plaintiff filed a Motion to Supplement (Doc. 62).  That motion asks for leave to file a brief on the issue whether the court should dismiss claims here with or without prejudice.  Doc. 62 at 3.  The court denies plaintiffs' motion to file additional papers.

"Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply."  *Hampton v. Barclays Bank Del.*, 478 F. Supp. 3d 1113, 1142 (D. Kan. 2020) (citing D. Kan. Rule 7.1(a), (c)), *aff'd on other grounds*, No. 20-3175, 2021 WL 3237082 (10th Cir. July 30, 2021).  "'Surreplies are not typically allowed.'"  *Id.* (quoting *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006)).  Plaintiff hasn't cited any exception to this general rule that would permit her to file an additional brief on the present motions.  The court denies plaintiff's Motion for Leave to File a Supplemental Response (Doc. 62).  The court also denies defendants' Motion to Strike (Doc. 65) as moot.

E.      **Dismissal With or Without Prejudice**

Finally, the court must determine whether the claims dismissed by this Order are dismissed with or without prejudice.  It's a close call.  The court is skeptical that plaintiff could cure the shortcomings that led the court to dismiss her claims.  Plaintiff is represented by experienced counsel.  So, one would imagine—if plaintiff had the ability to plead facts that'd cure the alleged shortcomings of her Amended Complaint—she promptly would have filed a motion to amend.  Plaintiff didn't.

The way this case could unfold troubles the court.  Defendants filed their motions seven months ago.  Plaintiff chose to litigate those motions on the merits instead of seeking leave to amend at any point before the court published this Order.  Amending after the court adjudicates a motion to dismiss represents a "wait-and-see approach[,]" which undermines judicial efficiency. *Herbel*, 2024 WL 4416849, at *28 n.33 (internal quotation marks omitted).  And the court wonders how any proposed amendment wouldn't represent an undue delay.  *See Minter v. Prime Equip. Co.*, 451 F.3d 1196,1206 (10th Cir. 2006) (explaining that "denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay" (quotation cleaned up)); *Castanon v. Cathey*, 976 F.3d 1136, 1145 (10th Cir. 2020) ("Unexplained delay alone justifies the district court's discretionary decision [to deny leave to amend]." (quotation cleaned up)).

Still, the court concludes that it must dismiss plaintiff's claims without prejudice. Whether to dismiss with prejudice is a matter committed to the court's discretion.  *Seale v. Peacock*, 32 F.4th 1011, 1027 (10th Cir. 2022).  *But see id.* (explaining that the Circuit reviews de novo whether "leave to amend would be futile" (quotation cleaned up)).  A "'dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) *and* granting leave to amend would be futile.'"  *Id.* (emphasis in original) (quoting *Knight v. Mooring Cap.*

22

*Fund, LLC*, 749 F.3d 1180, 1190 (10th Cir. 2014)).  But how can the court discern whether amendment is futile without a proposed amendment before it?  *See Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1131 (10th Cir. 1994) ("We do not require district courts to engage in independent research or read the minds of litigants to determine if information justifying an amendment exists.").  Our Circuit's precedent suggests that the court should err on the side of dismissing without prejudice.  *See id.* ("[W]here the record clearly reflects that the non-moving party possesses additional facts necessary for an amendment and where that party has repeatedly expressed a willingness to amend, the court should reserve to the non-movant leave to amend upon dismissal of the action."); *Seale*, 32 F.4th at 1029 (suggesting that dismissal with prejudice is appropriate only where claim's failure is "patently obvious"); *see also* 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1487 (3d ed. 2024) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper." (quoted and cited approvingly in *Seale*, 32 F.4th at 1029)).  *But see Seale*, 32 F.4th at 1028 (affirming dismissal with prejudice where pleading didn't "support the necessary elements" of the claim).

This Order's Rule 12(b)(6) dismissals are based on insufficient allegations, qualified immunity, and in some cases, both.  So, the court can't conclude that it's "patently obvious" that amendment "would be futile."  *Knight*, 749 F.3d at 1190 (quotation cleaned up).  The court thus makes this Order's dismissals ones without prejudice.  If plaintiff properly can plead facts to cure her claims' shortcomings, she must seek leave to amend within 20 days of this Order.  And that request must strictly comply with our local rule, D. Kan. Rule 15.1.  Should plaintiff fail to file a motion for leave to amend within 20 days of this Order, the Rule 12(b)(6) dismissals will convert to dismissals with prejudice.[5]

---

[5]    The court is mindful of *Herbel*'s decision to dismiss claims in that case with prejudice.  2024 WL 4416849, at *28 n.33.  The efficiency interest in that approach has some serious Rule 1 appeal.  But the

## IV.        Conclusion

Both defendants are entitled to qualified immunity on the claims plaintiff asserts against them.  The court thus dismisses those claims and directs the Clerk of the Court to close this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Jeff Soyez and Joel Ensey's Motion to Dismiss (Doc. 58) is granted.

**IT IS FURTHER ORDERED THAT** plaintiff Debbie K. Gruver's Motion to Supplement (Doc. 62) is denied.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Strike (Doc. 65) is denied as moot.

**IT IS SO ORDERED.**

**Dated this 28th day of March 2025, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

pleading context of *this case* differs, so the court reads our Circuit's precedent to suggest that dismissal without prejudice here is the better outcome.  Still, it's a close call.