## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DEBBIE K. "DEB" GRUVER, | |
| *Plaintiff*, | |
| vs. | |
| FORMER MARION COUNTY ATTORNEY JOEL ENSEY, in his individual capacity, | |
| MARION COUNTY SHERIFF'S DETECTIVE AARON CHRISTNER, in his individual capacity, | Case No. 6:23-cv-01179-DDC-GEB |
| & | |
| MARION COUNTY SHERIFF JEFF SOYEZ, individually and in his official capacity, | |
| *Defendants*. | |

## THIRD AMENDED COMPLAINT

COMES NOW the plaintiff, DEBBIE K. "DEB" GRUVER, through her undersigned counsel of record, and in support of her claims against the defendants, MARION COUNTY ATTORNEY JOEL ENSEY, in his individual capacity; MARION COUNTY SHERIFF'S DEPUTY AARON CHRISTNER, in his individual capacity; and MARION COUNTY SHERIFF JEFF SOYEZ, individually and in his official capacity, hereby states and alleges as follows:

## INTRODUCTION

1.     This action arises from a shocking, unprecedented and unconstitutional police raid in Marion, Kansas, a small Kansas town of approximately 1,900 citizens. Targeted in the Friday, August 11, 2023, raid were the offices and personnel of the local newspaper, the *Marion County Record.*

1

2.      Separately targeted by police during the August 11 raids were two other nearby homes: (1) the home of the paper's co-owner and publisher, Eric Meyer, and the paper's 98-year-old co-owner – Eric's mother, Joan Meyer; and (2) the home of the city's Vice-Mayor, Ruth Herbel.  Joan Meyer died the following day at 2:53 p.m. of sudden cardiac arrest.

3.      On August 11, Chief Gideon Cody of the Marion Police Department obtained and executed three search warrants for a newspaper's offices and two private homes ostensibly because a previously identified *Record* reporter, Phyllis Zorn, had accessed a local citizen's driving records from a public website, culminating in the seizure of numerous items including cellular phones, computer towers, server towers and external drives.

4.      *Marion County Record* reporter Deb Gruver, whose personal cellular phone was snatched away by Chief Cody during the raid on the *Record's* offices while she sat outside the building, while her *Record* computer tower was snatched away inside the building a short time later, now seeks justice and accountability under 42 U.S.C. § 1983 for the recklessly indifferent violation of her rights under the First and Fourth Amendments of the United States Constitution.

5.      In this amended suit, Ms. Gruver now seeks accountability under 42 U.S.C. § 1983 for the brazen constitutional violations of three defendants: Former Marion County Attorney Joel Ensey – who has made every effort to minimize his role in the raid to date, after acknowledging in a Press Release that the warrants were invalid; Marion County Sheriff's Deputy Aaron Christner, who provided the technical expertise necessary to craft the warrants and carry out the mission; and Marion County Sheriff Jeff Soyez, who was instrumental in all aspects of the raid – from the opening salvo to the celebratory post-raid pizza party.

6.      This *Third Amended Complaint* is filed pursuant to Fed. R. Civ. P. 15(a)(2).

## STATEMENT OF FACTS

Plaintiff hereby adopts by reference paragraphs one through six (1-6) inclusive, and, in addition, further states and alleges:

### *Lead-Up to the Raid*

7.    Deb Gruver is an award-winning journalist who began working as a Staff Writer with the *Marion County Record* in 2022 under Eric Meyer, the paper's co-owner and publisher. The *Record* is a weekly newspaper with offices located directly across the street from the Marion County District Courthouse.

8.    In August 2022, Ms. Gruver was new to town and sought out popular local establishments for review.  She ended up dining at the Parlour 1886 restaurant inside the Historic Elgin Hotel and wrote a glowing review, complimenting chef Kari Newell's spatchcock chicken with whole new potatoes and asparagus, followed by the "Death by Chocolate" cake for dessert. Chef Newell "outdid herself," Gruver wrote.

9.    On February 1, 2023, chef Newell took over ownership of the restaurant, changing the name to Chef's Plate at Parlour 1886.  The restaurant remained within the Historic Elgin Hotel, which was co-owned and operated by Tammy Ensey – the sister-in-law of Marion County Attorney Joel Ensey.

10.    Ms. Gruver and Ms. Newell maintained a friendly relationship until late April 2023, around the time of Chief Cody's hiring, when the relationship broke down.  Ms. Newell criticized Ms. Gruver's reporting and complained about her talking to "sources" while inside the restaurant – apparently after overhearing a telephone call.

11.    "I'm not the one [to mess with]," Ms. Newell told Ms. Gruver in a contentious text exchange.

12.     In June 2023, Ms. Newell opened a coffee shop, Kari's Kitchen, directly across the street from the Elgin Hotel.

13.     In June 2023, Ms. Newell's two restaurants, the offices of the *Marion County Record* and the Marion Police Department were all located within blocks of each other near downtown Marion.

14.      Meanwhile, on April 21, 2023, the *Record* confirmed that Gideon Cody had accepted a job offer from Marion Mayor David Mayfield to become the new Chief of the Marion Police Department.  Chief Cody came to Marion after 24 years with the Kansas City, Missouri Police Department, where he had most recently served as a Captain.

15.     In mid-to-late April 2023, around the time of Chief Cody's application for the job, the *Marion County Record* began investigating various allegations against Cody, based on anonymous sources who had worked with Cody in Kansas City but declined to go on record with their claims.

16.     The *Record* could not obtain Cody's personnel file from the KCMO police department to independently verify the allegations, so it did not publish the story at the time.

17.     Cody, however, was aware of the *Record's* investigation into his prior professional conduct.

18.     Specifically, Cody was aware that Ms. Gruver was the one conducting the investigation, having discussed the investigation with her around the time of his hiring in April 2023.

19.     On August 1, 2023, Kari's Kitchen hosted a public meet-and-greet event with United States Representative Jake LaTurner (R, 2nd Dist.), whose constituents as a congressman included the citizens of Marion.

20.     Three of the five members of the Marion County Board of County Commissioners were present at the public event.

21.     Mr. Meyer and a *Record* reporter, Phyllis Zorn, attended the event and were in line attempting to buy coffee when Chief Cody approached them and advised that Ms. Newell had asked them to leave.

22.     Newell later confirmed to reporters that she had asked Meyer and his reporter, Zorn, to leave, because she believed the newspaper "has a long-standing reputation for twisting and contorting comments within our community."

23.     On August 4, Eric Meyer sent an e-mail to both Chief Cody and Sheriff Soyez about a source who had supplied information about a local businesswoman.  At the time of the e-mail, Meyer relayed that they were not going to pursue the story about the businesswoman (later identified as Ms. Newell) but rather were going to pursue a story about law enforcement failing to enforce traffic laws for 25 years.

24.     Some of the events which then occurred between Friday, August 4, and Monday, August 7, were covered in a newspaper story written by Eric Meyer and published on Wednesday, August 9, 2023.

25.     The story, titled "Restaurateur accuses paper, councilwoman[1]" stated that Ms. Newell appeared before the Marion City Council on Monday, August 7 – less than one week after ejecting *Record* reporters from Congressman LaTurner's reception – and accused the *Record* of illegally obtaining drunken-driving information about her and then providing it to a city council member, Vice-Mayor Herbel.  Ms. Gruver was listed as a contributor to the story.

---

[1]

http://peabodykansas.com/direct/restaurateur_accuses_paper_councilwoman+5447newell+52657374617572617465 7572206163637573657320706170657065722c20636f756e63696c776f6d616e61e (accessed April 16, 2025).

26.     The August 9 story further stated that the *Record* and Vice-Mayor Herbel had both separately received information from a confidential source indicating that Ms. Newell's license had been suspended in 2008 due to a drunken-driving conviction and other driving infractions.

27.     The August 9 story further stated that Ms. Newell had confirmed to the *Record* directly after the council meeting in a discussion she initiated that the information was accurate.

28.     The August 9 story further stated that the *Record* had separately verified the information was accurate and had been obtained from a public website but had nevertheless decided against publishing the story.  This was corroborated by Eric Meyer's e-mail of August 4 (*see* ¶ 24, *supra*).

29.     In fact, *Record* reporter Phyllis Zorn had confirmed the accuracy of this information – which she had originally received from a local resident, Pam Maag, via a screenshot sent through Facebook – on the public Kansas Department of Revenue Driver's License Check website.

30.     After receiving the screenshot and seeking to independently verify the information, Ms. Zorn had reached out to the Department of Revenue to ask how to obtain the information, and they directed her to the same link she ultimately utilized.

31.     Kansas Department of Revenue spokesperson Zack Denney would later confirm to news outlets that the online search was legal.  "The website is public-facing, and anyone can use it," he said.

32.     The federal Driver's Privacy Protection Act, 18 U.S.C. 2721 (b)(5), allows access to information about a person's driver's status for research activities, so long as the personal information is not published, redisclosed, or used to contact individuals.  In this instance, the information was used to verify the confidential source's information and was not published.

33.    Instead of publishing the story, the *Record* consulted with an attorney and notified Chief Cody and Sheriff Soyez on August 4, 2023, that the source had alleged local law enforcement was aware that Ms. Newell did not have a valid driver's license and had ignored repeated violations of driving laws by Ms. Newell.  This was corroborated by Eric Meyer's e-mail of August 4 (*see* ¶ 24, *supra*).

34.    According to the *Record's* August 9 story, Ms. Newell also accused Vice-Mayor Herbel of "negligently and recklessly" sharing her personal information during the council meeting – she wanted to speak to the council so her colleagues would know "how vile [Herbel's] behavior can be."

35.    At the time of the city council meeting, Ms. Newell did not have a Kansas liquor license and the liquor license for her new restaurant, Chef's Plate at Parlour 1886, was still carried under the name of the prior owner, Ms. Ensey.

36.    Ms. Ensey's liquor license was apparently set to expire later in August.

37.    The August 9 story further stated that during the post-council meeting discussion with the *Record*, Ms. Newell also indicated she thought the information had been supplied to the source – whose identity she speculated about – by her estranged husband as part of an attempt in divorce proceedings to retain ownership of vehicles on the grounds that she did not possess a license.

### *The Application & Warrant*

38.    On Friday, August 11, 2023, Marion County Attorney Joel Ensey's staff delivered an *Application for Search Warrant* to Eighth Judicial District Magistrate Judge Laura E. Viar, who had been a Magistrate Judge since 2022, after formerly serving as Morris County Attorney.

39.    The *Application* sought a search warrant for "117 S. 3rd Street, Marion, Marion County, Kansas *** Above the glass is a sign that says "Marion County Record".

40.    By August 11, Chief Cody had been serving as Marion Police Chief while knowingly under investigation by Ms. Gruver and the *Record* since the time of his application and hiring, had removed *Record* personnel from a public meet-and-greet session with a United States Congressman at the request of a restaurant owner, Ms. Newell, and had become aware of the *Record's* acquisition of public information about Ms. Newell's past drunken-driving arrest, which had caused an inflamed response by Ms. Newell – the same person who had become angry after apparently overhearing Ms. Gruver's telephonic conversation with a source in April.

41.    By August 11, Chief Cody had also directly expressed to reporter Phyllis Zorn his support for her work – telling her that Eric Meyer and Deb Gruver were the real problem with the paper.

42.    The sworn *Application* attested that Chief Cody had probable cause to believe that two offenses against the laws of the State of Kansas had been committed: (1) K.S.A. 21-6107 – Identity Theft; and (2) K.S.A. 21-5839 – Unlawful Acts Concerning Computers.

43.    In the Affiant's attestation to the application, Magistrate Judge Viar scratched out the "Notary" line and verified Chief Cody's signature as "Magistrate Viar."

44.    The sworn *Application* recounted in some detail the recent history involving the *Record's* ouster from Kari's Kitchen on August 1 and the access of Kari Newell's KDOR records on the public website by *Record* reporter Phyllis Zorn.

45.    The sworn *Application* presented no information about Maag's involvement, other than to say she had originally provided the screenshot of the Newell KDOR record to Vice-Mayor Herbel.

46.     The sworn *Application* claimed that downloading of the KDOR records involved "either impersonating the victim or lying about the reasons why the record was being sought."

47.     The sworn *Application* stated that the individual who had allegedly "impersonat[ed] the 'victim' or [lied] about the reasons why the record was being sought" was not unknown – it was *Record* reporter Phyllis Zorn.

48.     The sworn *Application* did not address or acknowledge any federal or state laws which might preclude his intended search or reflect that Ms. Zorn's online search was not, in fact, illegal.

49.     The sworn *Application* did not assert any specific nexus between plaintiff Deb Gruver's personal cellular phone or *Record* computer tower and the alleged crime being investigated – Deb Gruver was never once mentioned in the nine-page *Affidavit*.

50.     The sworn *Application* did not assert any factual basis for believing that any *Record* employee's cellular phone or device aside from Phyllis Zorn's computer could have possibly been used to access the Kansas Department of Revenue records website.

51.     The sworn *Application* did not disclose or reference, in whole or in part, that the Eric Meyer e-mail of August 4, 2023, included the following statement from Mr. Meyer: "We initially were concerned whether the letter was accurate and, if so, whether it was obtained legally. Our lawyer's advice was that the information most likely would be available as public record and, therefore, it would not be illegal for us to possess the document, depending on how our source obtained it."

52.     The *Application* did not include any information stating or suggesting that the suspect(s) of the alleged crime obtained the KDOR records in order to defraud another person.

53. The *Application* did not include any information stating or suggesting that the suspect(s) of the alleged crime obtained the KDOR records in order to misrepresent another person.

54. The *Application* did not include any information stating or suggesting that the suspect(s) of the alleged crime obtained the KDOR records in order to subject another person to economic or bodily harm.

55. In the *Application* and resulting *Warrant*, Chief Cody sought and was granted access to "2. Digital Communications devices allowing access to the Internet or to cellular digital networks which **were or have been used** to access the Kansas Department of Revenue records website." (emphasis added)

56. In the *Application* and resulting *Warrant,* Chief Cody sought and was granted access to "3. A computer or digital device that **has been used** to access the Kansas Department of Revenue records website." (emphasis added)

57. In the *Application* and resulting *Warrant*, Chief Cody sought and was granted access to "5. **Conduct a preview search** of all located digital communications devices and digital storage media **to exclude from seizure those which have not been involved in the identity theft**, by use of manual or automated preview tools." (emphasis added)

58. Magistrate Judge Viar executed the *Search Warrant* at 9:00 a.m. on Friday, August 11, 2023.

59. Chief Cody did not separately submit an application seeking to search either Ms. Gruver's residence or Ms. Zorn's residence.

60. Chief Cody did obtain two additional warrants: (1) A warrant for the premises located at 611 S. Freeborn Street, Marion, Kansas, which was the home address of Marion, Kansas Vice-Mayor Ruth Herbel; and (2) A warrant for the premises located at 425 Locust Street, Marion,

Kansas, which was the home address of *Record* publisher Eric Meyer and his mother, *Record* co-owner Joan Meyer.

61. Similar to the *Application* & *Warrant* for the *Record's* offices, neither the 611 S. Freeborn warrant nor the 425 Locust warrant mentioned Ms. Gruver in any way, by suggestion or otherwise.

62. A fourth application, for Pam Maag's home, was rejected by Magistrate Viar.

***The Raid***



63. The photograph above shows Chief Cody directing and participating in the raid while his officers seize equipment from the *Record's* offices. Ms. Gruver's desk is shown on the bottom right.

64. After obtaining Magistrate Judge Viar's signature on the *Search Warrant*, Chief Cody ventured over to the *Record's* offices and spearheaded the raid, with the assistance of additional Marion Police Department officers and Sheriff's Deputies.

65. When Chief Cody arrived at the *Record's* offices, he approached Ms. Gruver, who was sitting next to Ms. Zorn on the steps outside the rear of the building.

66.    Chief Cody then handed Ms. Gruver a copy of the *Warrant.*

67.    Now standing behind her as she remained seated on the steps outside the building, Chief Cody then told Ms. Gruver, "we got all electronic devices."

68.    Chief Cody then went in front of Ms. Gruver as she remained in a seated position outside the building holding the *Warrant* and again said "we got all electronic devices."

69.    Ms. Gruver advised that she needed to call Eric Meyer, the owner of the premises.

70.    Chief Cody responded by reaching over the papers and violently snatching the phone out of Ms. Gruver's hand, without saying anything further at that time.

71.    The below still frames taken from body camera footage display Chief Cody snatching Ms. Gruver's personal cellular phone from her person as she sat outside the *Record's* offices in the course of effectuating an illegal search warrant that had nothing whatsoever to do with Ms. Gruver:



72.    The personal cellular phone was taken directly from Ms. Gruver's person and had not been left in the offices.

73.     There was no factual basis to believe Ms. Gruver's personal cellular phone was evidence of the alleged crime, or any crime.

74.     Ms. Gruver's cellular phone was not verified as having "been used to access the Kansas Department of Revenue records website."

75.     Rather than conducting a preview search on site to "exclude from seizure" a personal cellular phone which had "not been involved in the [alleged] identity theft," Chief Cody seized the phone and removed it from the premises along with the other equipment.

76.     One of the officers read Ms. Gruver, Ms. Zorn and an office administrator their *Miranda* rights while Chief Cody watched, though they were never placed under arrest.  This occurred after Chief Cody attempted to *Mirandize* Ms. Zorn but determined he was unable to recall the wording of the *Miranda* warning.

77.     At Chief Cody's direction, the law enforcement officers began removing equipment, including the computer towers of Mr. Meyer, Ms. Zorn and Ms. Gruver, a server tower, an external drive and the personal cellular phone of Ms. Zorn.

78.     The inventory of items seized appears below and contains both Ms. Gruver's personal cellular phone and her computer tower utilized for her work at the *Record*, which contained significant amounts of Ms. Gruver's work product and files generated in the course of her work at the newspaper.

| NO. | Quantity | Description of Property | Est. Value |
|-----|----------|------------------------|------------|
| 1 | 1 | DEB GRUVER CELL PHONE   IPHONE | |
| 2 | 1 | PHYLLIS TOWER THERMALTAKE CASE | |
| 3 | 1 | PHYLLIS PHONE   MOTOROLLA | |
| 4 | 1 | ERIC TOWER   COOLERMASTER | |
| 5 | 1 | SERVER TOWER   ANTEC CASE | |
| 6 | 1 | KIBOR RECORD | |
| 7 | 1 | DEB GRUVER THERMALTAKE TOWER | |
| 8 | 1 | WESTERN DIGITAL   EXTERNAL DRIVE | |
| 9 | 1 | OS TRIAGE  DIGITAL DATA | |

79.     The raid continued unabated for three-plus hours while Ms. Gruver and the other *Record* staff were forced to wait outside in temperatures that had reached 100ºF by 4:00 p.m.

80.     At one point during the raid, Marion Police Officer Hudlin rifled through Ms. Gruver's personal work files and advised Chief Cody he might "[W]ant to look through this desk? *** You will understand shortly."

81.     In fact, Officer Hudlin had located Ms. Gruver's file on "Capt. Gideon Cody" containing identifying information on CIs she had spoken with in the course of her investigation of Chief Cody.

82.     Chief Cody then bent down to look at the file, before muttering "Hmm…Keeping a personal file on me."

83.     The *Record's* August 9 column presented the first public summary of the *Record's* findings and criticisms of public officials related to this matter.  By executing a sweeping seizure of digital tools two days later – without probable cause and without respecting the limitations placed on the state by the First and Fourteenth Amendments to the U.S. Constitution – law enforcement not only retaliated against past speech but *sought to prevent further reporting on the same topic*, a textbook example of unconstitutional prior restraint.

14

84.    The *Record* was not a random data harvester or bad actor seeking to defraud someone.  It was a newspaper with a clear history of investigative journalism, exercising its First Amendment right to gather and report the news, including information of public concern about public officials.

85.    Courts have long recognized that a newsroom is not like any other place and seizing tools of journalism unlike any other seizure.  It is a constitutional act of last resort – not a first move based upon speculative or contested facts.

86.    Chief Cody and his law enforcement team also executed the two additional signed *Warrants* at the two private residences that day – Eric and Joan Meyer's home and Vice-Mayor Herbel's home – seizing additional items at those locations.

87.    In the below photograph, 98-year-old Joan Meyer is seen speaking with officers during the August 11, 2023, raid on her home – one day prior to her death from cardiac arrest:



***The Aftermath***

88.    Later that day, after Chief Cody's raid on the *Record's* offices was completed, Ms. Gruver went over to the Marion County Sheriff's office in an attempt to retrieve her personal cellular phone.

89.     Ms. Gruver spoke with Chief Cody inside the office and requested her phone back – telling Chief Cody she had nothing to do with any search of the driving records.

90.     "I actually believe you," Chief Cody replied with a grin.  He would not return the illegally seized personal cellular phone, however.

91.     After the raid on the *Record's* offices that day, Chief Cody called Kari Newell from his police vehicle to brag about his desecration of the United States Constitution – blissfully unaware that he was recording himself in the process.

92.     Kari Newell answered defendant Cody's call, saying "hey."

93.     Chief Cody responded, "hey, honey, we can't write anything, so…"

94.     Kari Newell responded, "yeah, no, I understand…I just got a message from somebody at the hotel saying that the whole staff of the newspaper's out on the sidewalk and all the computer equipment's leaving the building."

95.     Chief Cody responded, "yeah, surprising how that works, isn't it?"

96.     The raid ultimately made international news in the days to follow, with Chief Cody's behavior being universally questioned by major news outlets, constitutional scholars and even addressed by the White House Press Secretary in a daily press briefing.

97.     In the days which followed, Chief Cody remained insistent that his search and seizure had been lawful.  He made the following Facebook post on the Marion, Kansas Police Department's page on August 12, 2023, at 10:48 a.m.[2]:

---

[2]

https://www.facebook.com/story.php?story_fbid=pfbid02g2orRAMmqkGGCeRxMUPL8E5kjL5N3QMJiiejzmSQb
QQbviRKoUGMjYiZZxDsv57TI&id=100064381373990&mibextid=ZbWKwL (accessed August 30, 2023).

**Marion, Kansas Police Department**
August 12 at 10:48 AM · 🌐

The Marion Kansas Police Department has has several inquiries regarding an ongoing investigation.

As much as I would like to give everyone details on a criminal investigation I cannot. I believe when the rest of the story is available to the public, the judicial system that is being questioned will be vindicated.

I appreciate all the assistance from all the State and Local investigators along with the entire judicial process thus far.

Speaking in generalities, the federal Privacy Protection Act, 42 U.S.C. §§ 2000aa-2000aa-12, does protect journalists from most searches of newsrooms by federal and state law enforcement officials. It is true that in most cases, it requires law to use subpoenas, rather than search warrants, to search the premises of journalists unless they themselves are suspects in the offense that is the subject of the search.

The Act requires criminal investigators to get a subpoena instead of a search warrant when seeking "work product materials" and "documentary materials" from the press, except in circumstances, including: (1) when there is reason to believe the journalist is taking part in the underlying wrongdoing.

The Marion Kansas Police Department believes it is the fundamental duty of the police is to ensure the safety, security, and well-being of all members of the public. This commitment must remain steadfast and unbiased, unaffected by political or media influences, in order to uphold the principles of justice, equal protection, and the rule of law for everyone in the community. The victim asks that we do all the law allows to ensure justice is served. The Marion Kansas Police Department will nothing less.

😡😆 1.7K                                    6.5K comments  153 shares

98.     In his post, in which he uses the word "I" four times, Chief Cody acknowledged that he had been aware of the "Privacy Protection Act of 1980," found at 42 U.S.C. § 2000aa *et seq.,* which requires in most situations that law enforcement seek to obtain material from journalists through a subpoena, rather than through a surprise search conducted with a warrant.

99.     Chief Cody claimed an exception to the statute, however, which applies when "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate." 42 U.S.C. § 2000aa(b)(1).[3]

100.     Chief Cody did not explain in his post how there could have been probable cause to believe that any crime had been committed.

101.     Contrary to Chief Cody's statement that the department would be "vindicated," Marion County Attorney Ensey announced in a release (addressed further, *infra*) on Wednesday,

---

[3] Even if this were a correct application of the federal statute to the facts, the Marion County Attorney would have no jurisdiction to prosecute such an offense.

August 16, that he was withdrawing the August 11 warrants and had asked the court to release the evidence seized so that it could be returned to the owners of the property by law enforcement.

102.    In support of his determination, County Attorney Ensey stated in the release: "I have come to the conclusion that insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized."

103.    The Kansas Bureau of Investigation announced in an August 16, 2023, release that the investigation into the underlying data breach would continue under its jurisdiction, without review or examination of any of the evidence seized on Friday, August 11, 2023.

104.    The Kansas Bureau of Investigation later referred the matter to the Colorado Bureau of Investigation for further handling and investigation.

105.    Further contrary to his statement that he would be "vindicated," Chief Cody was suspended on September 28 and announced his resignation, effective immediately, the following Monday, October 2.  He is now "Former Chief Cody."

### *More Evidence Develops – Involvement of County Attorney Ensey*

106.    In statements to the press following the raids, Marion County Attorney Joel Ensey continuously asserted that his involvement in the raids was being overstated.

107.    To the contrary, his statements were part of a carefully orchestrated effort to avoid being placed in the proverbial line of fire, knowing well that the fallout from the raids would be fast and heavy.

108.     On the evening of Monday, August 7, 2023, Chief Cody sent a text to County Attorney Ensey, stating: "Call me tomorrow if you would.  I spoke to the victim and she is wanting to pursue misuse of office through the AGs office considering what happened at the council

meeting." County Attorney Ensey responded shortly thereafter, stating: "OK. I'll give you a call." "In the morning."

109.    On Tuesday, August 8, 2023, at 8:37 a.m., Chief Cody sent County Attorney Ensey a lengthy e-mail, titled "Crimes?" In his e-mail, Chief Cody floated all sorts of bizarre theories about laws that had been violated, including (1) The federal *Driver Privacy Protection Act* (DPPA), under which the Marion County Attorney's Office has no jurisdiction to charge; (2) wire fraud; (3) abuse of office/abuse of power; and (4) an entire section on "vicarious liability" and "co-conspirator liability."

110.    On Wednesday, August 9, 2023, Chief Cody sent County Attorney Ensey another text, again asking him to "[c]all me when you can this morning." He advised "[o]ther charges are coming" and "[i]t appears larger than when I looked at it first."

111.    On Thursday, August 10, 2023, at 11:24 a.m., Chief Cody e-mailed County Attorney Ensey the *Application* for the *Record's* offices, in addition to sending the other proposed applications in a group of e-mails.

112.    In a memo made to himself at 7:25 p.m. on Saturday, August 12 – the day after the raids – County Attorney Ensey acknowledged receiving the e-mails and opening them up, although he claimed he "had not fully reviewed them." This is an acknowledgment of having received, opened and reviewed the subject *Application*.

113.    In his memo, County Attorney Ensey also asserted he "knew that search warrants were being worked on, but I was not familiar with the subject matter, so it was outside of my comfort zone." This is an acknowledgment that he was aware of the subject matter of the ongoing investigation, which is also reinforced by the other text messages and e-mails referenced herein, as well as the allegations in Former Chief Cody's *Answer*.

114.    In his memo, County Attorney Ensey also asserted the following about the events of Friday, August 11: "The office manager, Karen Selznik, said that the chief had called and had a team on stand by to serve the search warrants.  I was not aware that this was being done.  I believe she asked me if I would like her to take them to the judge.  I told her she could take them up and let the judge decide.  I do believe I printed them off and gave them to her."  This is an acknowledgment that County Attorney Ensey had his office present the *Applications* and *Warrants* to Magistrate Judge Viar for approval and signature at Chief Cody's request – an act that would add credibility to the request over simply having a new, provisionally-accredited police officer (Cody) present the materials to the judge for consideration.

115.    The American Bar Association's Criminal Justice Standards for *Prosecutorial Investigations*, §2.8, "Search Warrants," recommends in §(d): "When the prosecutor is involved in an investigation, the prosecutor should review search warrant applications prior to their submission to a judicial officer.  In all other cases, the prosecutor should encourage police and law enforcement agents to seek prosecutorial review and approval of search warrants prior to their submission to a judicial officer."

116.    Further, in §(f), the ABA standards recommend: "In reviewing a search warrant application, the prosecutor should: (i) seek to assure the affidavit is complete, accurate and legally sufficient; (ii) seek to determine the veracity of the affiant and the accuracy of the information, especially when the application is based on information from a confidential informant; and (iii) seek to ensure that the affidavit is not misleading and does not omit material information which has a significant bearing on probable cause."

117.    The day after the raids, County Attorney Ensey began evaluating the scope – or lack thereof – of his potential immunity from liability.

118.    That morning, County Attorney Ensey spoke with a professional colleague about the *Mink v. Knox* case from the United States Court of Appeals for the Tenth Circuit, in which a prosecutor faced liability for reviewing and approving an affidavit and warrant, thus setting into motion a series of events the prosecutor knew, or reasonably should have known would cause others to deprive the person of their constitutional rights.

119.    On Tuesday, August 15, Ensey received advice that "every effort [should] be made to return the material seized to the owners in an expedited manner" because "[t]hese warrants will not sustain appellate review."

120.    Also on August 15, Ensey sent an e-mail to Chief Cody and Sheriff Soyez at 9:44 p.m., stating "I would like to have a meeting at the Sheriff's department at 11:30 to discuss matters and where we are moving forward.  Please let me know if you cannot make it."

121.    County Attorney Ensey then announced on Wednesday, August 16, that he believed the affidavits established probable cause to believe that an employee of the newspaper may have committed the crime of K.S.A. 21-5839, Unlawful Acts Concerning Computers (the second alleged crime of Identity Theft is not mentioned).

122.    County Attorney Ensey further advised in his Press Release of August 16, however, that he had "come to the conclusion that insufficient evidence exists to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized."  As a result, County Attorney Ensey announced he had submitted a proposed order asking the court to release the evidence seized and had asked law enforcement to return the material seized to the owners of the property.

123.    County Attorney Ensey was substantively involved in both the investigative phase and the administrative phase of the investigation which contributed to the issuance of the *Warrant* that brought Chief Cody to the back doorstep of the *Record's* offices on August 11.

### Most Recent Development –
### The Colorado Bureau of Investigation Interview of County Attorney Ensey

124.    Subsequent to the filing of Ms. Gruver's *Second Amended Complaint*, volumes of new evidence became available from the files of the two Colorado Bureau of Investigation (CBI) Agents who were specially sworn as Kansas Bureau of Investigation Agents on November 15, 2023, to investigate potential crimes: Agent John Zamora and Agent Michael Struwe.

125.    Among the scores of new evidence available was a 75-page transcript of an interview of Mr. Ensey completed by Agents Zamora & Struwe at Ensey's office on November 16, 2023.

126.    Mr. Ensey advised Agents Zamora and Struwe during the interview that, while it was possible for law enforcement to take a proposed search warrant to a local judge for approval without the County Attorney reviewing it as of August 2023 (prior to a rule change requiring prior review by the County Attorney, which was set into motion because of this matter), it never actually occurred: "I mean how it is typically is done, though, I mean it, I don't know of any warrants that have gone to the judge since I've been here without me reviewing them."

127.    Mr. Ensey agreed in the interview that the Magistrate Judge who signed the warrants "would have made the assumption that [he] reviewed it."

128.    When Mr. Ensey pulled the four warrants up on his computer at around 7:00 to 7:30 a.m. the day of the raids, he "breezed through" all four of them, observing that they were "all about the same" and "all had a lot of the same language," but were "each a little bit tailored to that specific person."

129.     When asked by Agent Struwe: "Hindsight being what it is, okay this blew up. Right?  Do you have any recollection on the front end of thinking, 'Okay, this is a news room, do we want to exercise some extra caution on seizing this stuff from a newsroom?  Are there some First Amendment issues here?'  Did any of that even register?  Did you hear if that registered with anybody else?", Mr. Ensey responded: "Yeah.  Um, you know, like and he cited it in the search warrant, like with the, um, like that US, uh, I don't know what statute that is, um, I don't remember how it's even worded, but, I mean, there was, was some discussion of that.  Um, **and** "Um, there is some like exemption with like the newsroom, but like it not being related to any type of confidential sources, or, or, anything like that.  I mean, just whether this information was, um, illegally garnered.  And so, um, I guess the thought from, and I admittedly didn't do much research into it at the time, um, but I mean, it was, it was a thought that it, I didn't think that it applied.  But I, like I said, I didn't do a lot of research."

130.     Agent Struwe responded by asking Mr. Ensey, "You think that that's something you saw in the affidavit itself?" and Mr. Ensey responded, "I, uh, I thought there was something mentioned in there."  Agent Struwe then stated, "I don't recall something in the warrants about any kind of, um, protections that the press might…have or First Amendment issues," and Mr. Ensey responded, "Okay.  Then there's – okay."

131.     Concluding the conversation on this subject, Agent Struwe stated, "It sounds like it's safe to say that, that wasn't really on the radar" and Mr. Ensey answered, "Uh, I mean, of – right."  Mr. Ensey then proceeded: "And I'll, I mean, also with like the plan, there wasn't a plan to go and, that I was aware of, that we were going to be going in and seizing these things at that point in time.  So, it wasn't a, something on the forefront that we're going in and going to be seizing these things, so it wasn't a, anything I felt like I probably needed to be worrying about at

that time because we're plan was to go try and do some IP search warrants and figure out exactly what it done and, what, who did what."

132.    Agent Struwe responded by asking, "Okay.  So, when you just breezed through these search warrants, are you saying you didn't even really understand that these were for like brick and mortar things?"  Mr. Ensey answered: "No.  I mean, I, knew what they were for."

133.    Later in the interview, Mr. Ensey conceded that he went into the office on Saturday – the day after the raids, and knowing what had been seized the day before – and began investigating the possibility of actually rescinding the search warrants: an unequivocal admission by Mr. Ensey that the warrants were "bad," or improperly issued.

134.    On this point, Mr. Ensey stated: "So, so I think that would be like, I talked to another attorney, but I think that that's essentially what, I mean, did you, the search warrant's been served, so, like you can't really rescind the search warrant after that, at that point…I mean, it's been done."

135.    In follow-up on this issue, Agent Struwe stated: "So, I mean, that cat's out of the bag.  They were bad warrants."  And: "Straight up.  Whether you read 'em or you didn't, I read 'em.  They're bad."  To both statements by Agent Struwe, Mr. Ensey responded: "Right."

136.    During the interview, Mr. Ensey then recounts being contacted by Sedgwick County (Eighteenth Judicial District) District Attorney Marc Bennett, bringing his attention to the Tenth Circuit [*Mink*] case from Colorado, which led to a discussion between the two about the warrants.

137.    On Monday [August 14], Mr. Ensey sat down to re-review the warrants in detail – the following exchange occurred during the interview about Mr. Ensey's re-review:

AGENT STRUWE:    Okay.  So, Monday the 14th, like sit down, focus, read these things.

JOEL ENSEY:         Yeah.

AGENT STRUWE:    What hap – you know, what, what are your thoughts when you do that?

JOEL ENSEY:    Oh sh*t.

AGENT STRUWE:    Okay.

JOEL ENSEY:    I mean, –

AGENT STRUWE:    Yeah.

JOEL ENSEY:    Like, It's not good.

AGENT STRUWE:    Yeah.

JOEL ENSEY:    They weren't good.

AGENT STRUWE:    I appreciate your candor.

138.    As the interview proceeded, Mr. Ensey explained why he "just didn't think that there was enough there, enough nexus…"

139.    Agent Struwe asked Mr. Ensey: "Any thoughts on the underlying crime itself? Apart from the nexus which I fully get and agree with you."

140.    Mr. Ensey responded: "Like the identity theft, um, I remember Cody sitting here one time, um, and I, I told him, I go, "I don't know that identity theft fits here."

141.    According to Mr. Ensey, Former Chief Cody responded, "I don't think that identity theft fits here," and "I looked the statute up and down and it fits."

142.    Mr. Ensey told Agent Struwe he did not push back on Former Chief Cody's assertions.  But, Mr. Ensey continued, "[t]hat's an argument I should've had."

143.    Mr. Ensey was not aware that Cody – his local Chief of Police – only had a provisional law enforcement accreditation.

144.    In explaining his analysis further, Mr. Ensey told Agent Struwe: "I mean, reading it, I mean, there was a, I didn't feel like I, I mean, identity theft was in, in those search warrants, um, the, like, the US Code, I mean, all that, that stuff, I mean, I, that was part of what I was talking to [KBI Special Agent Todd Leeds] **about that I don't really understand what we have here, what was accessed, how was it, I mean, whether that was legal or illegal**, um, uh, I mean, I remember thinking in the beginning of it, like, if this stuff was illegally obtained and then trying to deny somebody a, a liquor license with illegally obtained material was a concern that I had had, **but I didn't know if that was, if that, if a law had been broken there or not..."** (emphasis added)

145.    Mr. Ensey then recounted spending most of Tuesday [the 15th] on the phone, discussing the warrants, and also remembered discussing the situation with KBI Special Agent Leeds that day, "Um, kind of relaying the concerns and (unintelligible) especially after getting the, the email from, from Mark (sic) and just...you know, and not, this, this isn't good...and telling Todd [Leeds], I was like, 'This, these aren't good.  We're not, these aren't good warrants.'"

146.    Recounting a conference call which occurred on Tuesday with KBI representatives, after he had made the determination that all of the material seized had to be returned, Mr. Ensey remembered telling them, "You can still come down but I don't, you know, it's up to you if you come down but it, there's no, I guess, need at this point if, if because everything's going back.  I mean, I don't think the search warrants are good and we've got to get that evidence back."

147.    Later in the interview, Mr. Ensey again recounted having initially made the decision to attempt to rescind the warrant itself, in addition to returning the materials seized:

AGENT STRUWE:   Okay. So you knew the judges blessed this.  You said you wrote a couple, or I think maybe you said two, um, two motions to return the evidence.  Did any motions get denied?  Were you, you know.

JOEL ENSEY:        So I had, so I had talked to Mark (sic) about like the motion to rescind.  And like I talked about earlier like it's a fallacy or whatever, I mean, because it's already been done so you can't rescind the motion.

AGENT STRUWE:   Okay.

JOEL ENSEY:        Um, so I had mentioned that to, to the judge and I don't remember exactly what he said.  But, you know, he's not ruling on the motion or anything like that.  But I didn't even end up filing that one.  I just filed the motion to re, return the seized property.

148.    Later in the interview, Agent Zamora asked Mr. Ensey for his interpretation of the term "in and upon, in or upon" within the warrant in the context of Ms. Gruver's phone having been seized.  Mr. Ensey responded, "Right.  I don't know if I have a, I mean, opinion on it, right."

149.    Immediately after this statement by Mr. Ensey, Agent Zamora queried Mr. Ensey about whether he was able to articulate any crime that was, in fact, committed:

AGENT ZAMORA: No.  And I get it.  It's, it's, it's kinda tricky.  Okay.  I, but I just had to ask because we saw that in there.  Um, so when you were able to look at the warrants and then you had that, 'Hmm, sh*t moment,' as you said, you had mentioned identity theft.  You didn't think that was a crime. **Did you see, would you be able to articulate any crime that was in fact committed let's say with those, with the information that you had on the warrants?**  Saying, okay, well, this was or this wasn't, this wasn't and this wasn't.  Or was it overall like, 'Mm, we need more." (emphasis added)

JOEL ENSEY:        **Right.  I mean, it was we need more**.  Um, and it's been a while since I've looked and…"  (emphasis added)

150.    When asked by Agent Zamora during the interview if anything crossed his mind "like, wow, how did it get through, you know, to a signature [by the judge]?"  Mr. Ensey stated: "That was one, you know.  Um, I mean, it obviously crossed my mind, you know.  Like, why, why did this get signed but…"

151.    Agent Struwe and Mr. Ensey then had the following exchange:

AGENT STRUWE:    – she [Magistrate Judge Viar] would have, she would have made the assumption that you reviewed it [the warrants].

JOEL ENSEY:        Yeah.  I would, I would, I would think.

AGENT STRUWE:    So on the back end you're kind of in the position of going, "Wow, she signed this," but she probably thought that I reviewed it and now I'm going to go ask that another court or another judge undo this, give all this stuff back.  There was, at the bare minimum, a lack of communication, I guess.

JOEL ENSEY:        Yeah.

AGENT STRUWE:    Right.

152.    Mr. Ensey's statements to the CBI Agents establish that he could not, and did not reasonably conclude that the *Application* established probable cause to believe that any crimes were committed at the time he had the warrant materials delivered to the Magistrate Judge – an act he knew would lead the judge to believe he had reviewed and approved them.

153.    Despite being aware of the investigation ahead of time and discussing his concerns with Chief Cody that "we need more [information to establish a crime]," he failed to appreciate or

acknowledge at the time he approved the warrants a fact that he would clearly communicate to the CBI Agents: the warrants were "bad."

154.    The warrants were so "bad" that Mr. Ensey drafted a motion to rescind the actual warrants, before determining it was too late to do so.

155.    Mr. Ensey's statements to the CBI Agents also reinforce a fact Mr. Ensey had already admitted in his press release: "insufficient evidence exist[ed] to establish a legally sufficient nexus between this alleged crime and the places searched and the items seized."

156.    Mr. Ensey's own admissions to the CBI Agents reflect that, at minimum, Mr. Ensey utterly failed to make any determination at all as to whether probable cause existed to support that a crime had been committed – while having his own reservations about this issue, he hastily resigned himself to the idea of simply acquiescing to law enforcement's request that he provide his tacit approval by having the warrants delivered.

### Involvement of Marion County Sheriff Soyez

157.    Upon information, Marion County Sheriff Jeff Soyez and Former Chief Cody have been friends for many years – dating back to Soyez's tenure as a railroad detective in Kansas City, where Cody served as Captain with the KCMO PD – and it was Soyez who contacted Cody and encouraged him to apply for the open position at the Marion Police Department in April 2023.

158.    For his own part, Soyez had not been in Marion particularly long before the raids – having been appointed to the Sheriff's post in Marion County the year prior, in 2022.

159.    It is also believed that Sheriff Soyez was instrumental in persuading his employee, Marion Mayor David Mayfield, to hire Cody to the Chief position.

160.    Having formed a new alliance in Marion, and with both Soyez and Cody harboring animus toward the *Record*, including Ms. Gruver, the two top law enforcement officials were

primed to act aggressively when Eric Meyer sent his Friday, August 4 e-mail to the two of them, notifying them of the KDOR record issue.

161.    Notably, City Administrator Brogan Jones – who was also forwarded the KDOR record information from Vice-Mayor Herbel – immediately took the position that the KDOR record was a state oversight issue, and the Marion Police Department would not be looking into the matter.

162.    On Monday, August 7, Mayor Mayfield overruled City Administrator Jones and directed Chief Cody to begin an investigation into Vice-Mayor Herbel and the *Record*.

163.    Later that evening, Kari Newell appeared before the meeting of the Marion City Council in conjunction with her efforts to obtain a catering license for her new restaurant, Chef's Plate, since the license was still held at that time by County Attorney Ensey's sister-in-law, Tammy Ensey.

164.    At the City Council meeting, Newell lashed out about the allegedly illegal access to her KDOR record, having now been told by Chief Cody that someone at the *Record* had stolen her identity.

165.    Newell said she was going to "place this with the County Attorney."  "This is going to become a case," she threatened.

166.    The next day, Tuesday, August 8 – the same day Chief Cody sent his "Crimes?" e-mail to County Attorney Ensey – Cody met with Sheriff Soyez, who agreed to join in his investigation into and intended attack on the *Record*.

167.    Sheriff Soyez had regularly stated that he did not like Ms. Gruver or approve of Eric Meyer's negative outlook, stating that Meyer and the paper should have been more positive about Marion, including Marion government and Marion businesses.

168.    Sheriff Soyez's conspiracy against the *Record* also had the obvious potential benefit of allowing him to keep Kari Newell's illegal driving habits away from the press – illegal driving the Sheriff's Office and the Marion Police Department had allowed to transpire.

169.    On Wednesday, August 9, a meeting of law enforcement occurred in Marion. Present were KBI Special Agent Leeds, Chief Cody, Officer Hudlin, Sheriff Soyez & Det. Christner.

170.    Special Agent Leeds was provided paper copies of documents pertaining to the investigation at that time.

171.    Special Agent Leeds informed Chief Cody and Sheriff Soyez that he would need to speak with members of the KBI Computer Crimes Unit (CCU) on exactly how to proceed with the investigation, and that he would be back in touch the following week.

172.    Sheriff Soyez later told CBI Investigators that Chief Cody "presented his entire case" to Special Agent Leeds at the August 9 meeting.

173.    Following the meeting on August 9, Sheriff Soyez stopped by to see County Attorney Ensey and told him "Here's the deal.  You're getting ready to get a big, old, nasty, hairy case dropped in your lap.  I would suggest you hire a special prosecutor and just stay away from this entire case."

174.    Sheriff Soyez enlisted deputies Matt Regier, Aaron Christner and Steven Janzen, and informed Chief Cody that Christner was specifically allowed to assist the Marion Police Department with the warrants because of his specialized training in computer forensics.

175.    Detective Christner advised Cody and Soyez not to serve a preservation warrant on the *Record's* internet provider and to jump straight to the search warrant.  A preservation warrant is a less intrusive means of obtaining the same evidence.

176.    Detective Christner then drafted the *Application*.  When completed, he sent it on to Chief Cody so that Cody could edit and sign it in his own name, and with his own professional background included, since Christner did not feel comfortable swearing to an affidavit that he did not do the investigation on.

177.    On Thursday, August 10, Cody and Soyez discussed the draft *Affidavits*, including those for Herbel and Maag, and Soyez suggested adding a fourth warrant for Eric Meyer's home.

178.    Also on August 10, Cody sent Soyez a text at 7:04 a.m., stating "Guess what I found?"

179.    After Soyez responded, "What?", Cody stated "Eric admits in the news article that they downloaded the information."

180.    After receiving Chief Cody's final drafts of the *Affidavits*, Detective Christner – at Sheriff Soyez's continued direction – drafted the actual *Warrants* to be submitted to the Magistrate Judge for signature.

181.    Once the *Applications* and *Warrants* were finalized, they were presented to Magistrate Judge Viar for signature by a representative of County Attorney Ensey's office the morning of Friday, August 11, 2023.  The *Record*, Herbel and Eric Meyer warrants were signed; the Pam Maag warrant was rejected.

182.    Sheriff Soyez supplied Sheriff's Detectives Christner and Steven Janzen to Cody to assist with the raid of the *Record's* offices.

183.    While Chief Cody was inside the *Record's* offices with the raids underway, Cody called Soyez to bring him up to speed and obtain additional directions.

184.    The 'bringing up to speed' included discussion of the "preview search" Det. Christner had conducted upon entering the *Record's* newsroom – as required by the warrant – by

connecting an external drive via a USB port to Ms. Zorn's *Record* computer, and then executing a software application titled osTriage, which he had previously loaded onto the external drive.

185.   Using vague keyword searches such as "vehicle" and "Kansas," the sham searches produced all false hits.

186.   Despite the "preview search" showing no evidence of a crime, Chief Cody directed that Ms. Zorn's computer be seized.

187.   Following the "preview search" on Ms. Zorn's computer, Officer Hudlin stated, "We'd be here all freakin' day if we were going to do that to all those computers."

188.   After informing Sheriff Soyez of these events, Chief Cody was heard stating into the phone, "Alright, we'll just take them all."

189.   Chief Cody then turned to Det. Christner and Officer Hudlin and exclaimed, "Let's get the f*ck out of here."

190.   Following the call with his co-conspirator, Sheriff Soyez, Chief Cody directed that Eric Meyer's *Record* computer, Ms. Gruver's *Record* computer and the network file server be seized – all without first attempting a preview search on those devices.

191.   When the raids had all been completed, Cody drove to the Sheriff's Office to debrief on the day's events and partake in a celebratory pizza party, which Soyez had arranged.

192.   In fact, Soyez was anxious to get the pizza party started before the raids were even concluded, texting Chief Cody at 1:03 p.m., "If you want to start freeing people up when you can the food is here."

193.   During the pizza party, Chief Cody related to Soyez that it "made my day" to yank the cell phone out of Ms. Gruver's hand – the second time, at least, that he had bragged about it that day (the first being toward the tail end of his phone call with Kari Newell).

194.     Sheriff Soyez's role in violating Ms. Gruver's constitutional rights was far beyond peripheral or incidental – he conspired with Chief Cody at the outset to take down the *Record*, based upon their shared animus for the newspaper, instructed the technical expert in his office – Det. Christner – to draft the warrant materials and physically participate in the raid, directed Chief Cody to take additional equipment during the raids without the required "preview search," and arranged a celebration immediately following the raids.

195.     Det. Christner later recalled Sheriff Soyez having stated that Ms. Newell would likely "go after" law enforcement in a civil suit if law enforcement did nothing about the people who shared her driving record – another statement aimed at motivating his underlings to join the conspiracy to take down the *Record.*

196.     Sheriff Soyez could have withdrawn from the conspiracy at any time prior to August 11, but instead remained engaged and involved in helping direct the process all the way through to completion.

### *Involvement of Marion County Sheriff's Det. Aaron Christner*

197.     Though he drafted the search warrant applications for the *Record's* office, Det. Christner stated in his e-mail forwarding the draft to Chief Cody, "I am not comfortable swearing to an affidavit I did not do the investigation on."

198.     The search warrant applications drafted by Det. Christner contained numerous false statements.

199.     One false statement in Det. Christner's draft application was that Ms. Zorn would have had to select from several "options available on the Kansas DOR records website" – in other words, that a user must provide a reason for accessing the records.

200. Christner even provided a screenshot of a website purporting to list these options, although the KDOR website had no such options on its page.

201. Another false statement in Det. Christner's affidavit was that Ms. Zorn could have only accessed the KDOR records by "either impersonating or lying about the reasons why the record was being sought" – the records were open and Ms. Zorn did not have to impersonate another person or lie about her reasons for obtaining the record in order to lawfully use the Kansas Driver's License Status Check website.

202. Det. Christner also knew that Vice-Mayor Herbel had received a copy of the information from Pam Maag on Wednesday, August 2, 2023, and that Ms. Zorn did not access the KDOR website until Friday, August 4, 2023, but nevertheless claimed in his application that someone from the *Record* had supplied Vice-Mayor Herbel the information as a plan to retaliate against Kari Newell for the dustup at the Rep. LaTurner event.

203. Det. Christner also omitted material facts from the affidavit, which would have weighed against a finding of probable cause to support the sought warrant(s).

204. One such omission by Det. Christner was the fact that the KDOR Driver's License Check website permits any requester with Ms. Newell's first and last name, DOB and Driver's License number to view the status of Ms. Newell's license – all information the *Record* had already admitted it had been provided by the source.

205. Another omission by Det. Christner, as set out in ¶ 50, *supra*, was that the *Record's* owner, Eric Meyer, had already written law enforcement about the issue and offered to assist in any investigation.

206.    Another omission by Det. Christner was that the Kansas statute related to driver's license records, K.S.A. 74-2012, specifically states that "all motor vehicle records shall be subject to the provisions of the open records act," subject to certain exceptions not applicable in this case.

207.    Det. Christner's application also omitted any reference to the protection of First Amendment rights of journalists.

208.    Det. Christner was the only known officer with the technical knowledge to complete the warrant materials and assist with the actual raids – a fact which Sheriff Soyez recognized in specifically agreeing to allow Det. Christner to assist with the *Applications/Warrants* and the actual raids (including the sham "preview search").

209.    Det. Christner was so intent on satisfying his boss, Sheriff Soyez, that he actually prepared and sent Chief Cody a draft of a probable cause affidavit for the arrest of Vice-Mayor Herbel, even though he admitted he could not identify a crime she had committed under Kansas law.

## THE PARTIES, JURISDICTION & VENUE

Plaintiff hereby adopts by reference paragraphs one through two hundred and nine (1-209) inclusive, and, in addition, further states and alleges:

210.    Plaintiff, DEB GRUVER ("plaintiff Gruver" or "Ms. Gruver") is an adult individual and a citizen of Kansas, residing in Wichita, Sedgwick County.

211.    Defendant, FORMER MARION COUNTY ATTORNEY JOEL ENSEY ("County Attorney Ensey," "defendant Ensey" or "Mr. Ensey") was at all times relevant herein the duly elected County Attorney of Marion County, Kansas, though he no longer serves in this office.  Mr. Ensey is being sued in his individual capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims. Former County Attorney Ensey is a citizen of the State of Kansas.

212.   Defendant, MARION COUNTY SHERIFF JEFF SOYEZ ("Sheriff Soyez," "Soyez," or "defendant Soyez"), is and was at all times relevant herein the duly elected Sheriff of Marion County, Kansas.  Sheriff Soyez is being sued in both his individual capacity and his official capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims and in his official capacity for violations of the Privacy Protection Act, 42 U.S.C. § 2000aa.  Sheriff Soyez is a citizen of the State of Kansas.

213.   Defendant, MARION COUNTY SHERIFF'S DETECTIVE AARON CHRISTNER ("Det. Christner" or "defendant Christner") is and was at all times relevant herein a Detective with the Sheriff's Office of Marion County, Kansas.  Det. Christner is being sued in his individual capacity for plaintiff Gruver's 42 U.S.C. § 1983 claims.

214.   Jurisdiction of this action is conferred by 28 U.S.C. § 1331, which provides original "federal question" jurisdiction over all civil actions arising under the United States Constitution and laws or treaties of the United States.  Jurisdiction is further conferred by 28 U.S.C. § 1343(a)(3), which provides for original jurisdiction in suits authorized by 42 U.S.C. § 1983.

215.   Plaintiff Gruver's claims for damages herein are authorized by: (1) 42 U.S.C. § 1983, which provides for redress for the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States; (2) the First Amendment of the United States Constitution, which protects freedom of speech and the press; (3) the Fourth Amendment of the United States Constitution, which protects the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; (4) 42 U.S.C. § 1988, which allows the prevailing party to collect a reasonable attorney's fee as costs in any action or proceeding to enforce 42 U.S.C. § 1983; and (5) 42 U.S.C. § 2000aa-6(f), which provides that "a person having a cause of action…shall be entitled to recover actual damages but

not less than liquidated damages of $1,000, and such reasonable attorneys' fees and other litigation costs reasonably incurred as the court, in its discretion, may award…"

216.   Venue is proper in the U.S. District Court for the District of Kansas under 28 U.S.C. § 1391(b)(1) & (2), as the events giving rise to plaintiff Gruver's claims occurred in Marion, Kansas.

217.   This Court has personal jurisdiction over each defendant.

218.   This action asserts no claims under the Kansas Tort Claims Act and thus the notice provisions of K.S.A. 12-105b(d) are inapplicable.

**FIRST COUNT:** *Violation of Plaintiff Gruver's Rights under the First Amendment of the United States Constitution & 42 U.S.C. § 1983 – Defendant Soyez*

Plaintiff hereby adopts by reference paragraphs one through two hundred and eighteen (1-218) inclusive, and, in addition, further states and alleges:

*Retaliation and Direct Violation of the First Amendment*

219.   Under 42 U.S.C. § 1983, a person may recover damages for a deprivation of his or her constitutionally protected rights when that injury is inflicted under color of state law.  Sheriff Soyez directly caused a violation of Ms. Gruver's rights under the First Amendment of the United States Constitution when he engaged in a conspiracy with Chief Cody to raid the *Record's* newsroom illegally and seize all electronic devices on the property.

220.   Sheriff Soyez's conspiracy with Chief Cody put law enforcement officers, including two of Sheriff Soyez's deputies, at the door of the *Record's* offices with the illegal warrants – an act he knew or reasonably should have known would lead to Ms. Gruver's personal cellular phone and *Record* computer being illegally seized.

221.   The First Amendment to the U.S. Constitution guarantees that "Congress shall make no law…abridging the freedom of…the press."

38

222.    The protections of the First Amendment are extended to local governments and their officials through application of the Fourteenth Amendment to the U.S. Constitution.

223.    Prior to the unprecedented newsroom raids and seizure of Ms. Gruver's devices, it was clearly established that the First Amendment guaranteed the freedom of the press to gather and report information about matters of public concern.

224.    Prior to the unprecedented newsroom raids and seizure of Ms. Gruver's devices, it was clearly established that the First Amendment prohibited government officials, including the policy, from interfering with the freedom of the press to gather and report information about matters of public concern.

225.    Prior to the unprecedented newsroom raids and seizure of Ms. Gruver's devices, the First Amendment protections afforded to members of the press in the context of searches and seizures, and the requirement that the Fourth Amendment be adhered to with "scrupulous exactitude," was also clearly established – even if not recognized by Sheriff Soyez, Det. Christner or County Attorney Ensey.

226.    The seizure of Ms. Gruver's personal cellular phone and *Record* computer abridged her rights under the First Amendment by restricting her ability to gather and report information about matters of public concern.

227.    The unprecedented raids and seizure of Ms. Gruver's devices would chill a person of ordinary firmness from continuing to report on local events in Marion.

228.    Sheriff Soyez's conspiracy with Chief Cody to raid and take down the *Record* was motivated by his preexisting ill will or spite towards the newspaper and its reporters.

229.    Sheriff Soyez's conspiracy with Chief Cody to raid and take down the *Record* began with Sheriff Soyez's agreement to sign on to the operation on August 8.

230.    Sheriff Soyez's conspiracy with Chief Cody to raid and take down the *Record* continued with his participation in the law enforcement meeting with Special Agent Leeds on August 9, and his act of directing a deputy with unique and crucial technical expertise – Det. Christner – to help draft the warrant materials and participate in executing on the same.

231.    Despite volumes of information available about the collective efforts of law enforcement to plan and execute on the raids during the week of August 7-11, 2023, only one individual has been identified as possessing the requisite technical expertise to draft appropriate warrant applications, help conduct "preview searches" or seize the *Record's* equipment, and that individual is Det. Christner.

232.    Det. Christner would not have become involved as an instrumental and integral member of the law enforcement team which orchestrated and executed the raids without Sheriff Soyez's direction.

233.    Sheriff Soyez's conspiracy with Chief Cody to raid and take down the *Record* continued with his input on the search warrants on August 10, as evidenced by his recommendation to seek an additional warrant for Eric Meyer and Joan Meyer's home.

234.    Sheriff Soyez's conspiracy with Chief Cody to raid and take down the *Record* continued on the day of the raids, August 11, when Chief Cody called Sheriff Soyez to recap the day's events and obtain his input.

235.    Sheriff Soyez's input, based upon a body cam recording of the call from Chief Cody's end of the line, was clearly to skip the sham "preview searches" of the remaining devices besides Ms. Zorn's *Record* computer and seize them.

236.    At any stage in the conspiracy, Sheriff Soyez could have withdrawn or even affirmatively encouraged Chief Cody to abandon his efforts, but Sheriff Soyez failed to do so.

237.    Sheriff Soyez knew or reasonably should have known that Ms. Zorn and the *Record* had committed no illegal act in utilizing Ms. Newell's information they had already been provided to access open records on a public-facing state website.

238.    Accordingly, Sheriff Soyez knew or reasonably should have known that no probable cause existed to believe any crime had been committed.

239.    Having been a recipient of Eric Meyer's original e-mail to law enforcement, notifying them of the situation with Ms. Newell's record, Sheriff Soyez knew or reasonably should have known that the requisite *mens rea* (such as intent to defraud) did not exist to support the violation of a Kansas criminal statute.

240.    Sheriff Soyez knew or reasonably should have known that the *Application* and *Warrant* were substantively invalid as existing evidence did not establish a legally sufficient nexus between the alleged crime and the places searched or the items seized.

241.    Sheriff Soyez is liable in his individual capacity for his conduct violating Ms. Gruver's constitutional rights as part of his conspiracy with Chief Cody to take down the *Record*.

242.    Sheriff Soyez's acts were done in retaliation for Ms. Gruver and the other *Record* reporters exercising their protected and clearly established rights under the First Amendment of the United States Constitution.

### Prior Restraint

243.    The seizure of Ms. Gruver's cellular phone and *Record* computer the day after the *Record* published an article critical of public officials and notified law enforcement of forthcoming critical articles constituted a prior restraint, which is presumptively unconstitutional under long-standing First Amendment doctrine.

244.    The warrant functioned as a tool to silence further reporting – particularly reporting by the journalists most critical of local law enforcement.

245.    By seizing a journalist's unpublished work, newsgathering tools and confidential source material with no probable cause – and in direct response to a published article – defendants violated the core prohibition against prior restraints of speech and the press.

246.    Even where a story has been published, government conduct which interferes with ongoing or future reporting can constitute an unconstitutional prior restraint.  *See CBS, Inc. v. Davis*, 510 U.S. 1315 (1994); *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978).

247.    The constitutional prohibitions against prior restraint were well-established on the date of the raids.

248.    The effort at prior restraint by Chief Cody and Sheriff Soyez, as part of their conspiracy to take down the *Record*, directly led to Ms. Gruver's cellular phone and *Record* computer being seized in the course of executing on the warrant.

### *Remaining Allegations*

249.    Sheriff Soyez's actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, and he may be subjected to punitive damages.

250.    As a direct and proximate result of defendant Soyez's conduct violating Ms. Gruver's constitutional rights, plaintiff Gruver has sustained damages, including, but not limited to, emotional distress, mental anguish and physical injury.  Defendant Soyez's malicious and recklessly indifferent acts justify an award of punitive damages.

**SECOND COUNT:** *Violation of Plaintiff Gruver's Rights under the Fourth Amendment of the United States Constitution & 42 U.S.C. § 1983 – Defendants Ensey, Soyez & Christner*

Plaintiff hereby adopts by reference paragraphs one through two hundred and fifty (1-250) inclusive, and, in addition, further states and alleges:

251.    Under 42 U.S.C. § 1983, a person may recover damages for a deprivation of his or her constitutionally protected rights when that injury is inflicted under color of state law.  County Attorney Ensey, Sheriff Soyez and Detective Christner acted in their individual capacities in violating Ms. Gruver's rights under the Fourth Amendment to the United States Constitution.

252.    The Fourth Amendment to the United States Constitution protects, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

253.    The protections of the Fourth Amendment to the U.S. Constitution are extended to local governments and their officials through application of the Fourteenth Amendment to the U.S. Constitution.

254.    Prior to the unprecedented newsroom raids and seizure of Ms. Gruver's devices, it was clearly established that the Fourth Amendment prohibited the government, including the police, from raiding a person's home or a corporation's offices without a valid warrant, issued upon probable cause, supported by an application made under oath or affirmation and which particularly described the items to be seized.

255.    The *Application* was facially invalid in that it contended a search on a public-facing governmental website was illegal and contradicted the federal and/or state laws protecting journalists from search and seizure of journalistic materials.

256.    Further, the *Application* and *Warrant* were facially invalid in that no probable cause existed to support that crimes under K.S.A. 21-6107 – Identity Theft, or K.S.A. 21-5839 – Unlawful Acts Concerning Computers, or any other crime, had been violated.

257.     The *Application* and *Warrant* were substantively invalid as existing evidence did not establish a legally sufficient nexus between the alleged crime and the places searched or the items seized.

258.     County Attorney Ensey is liable in his individual capacity for his conduct violating Ms. Gruver's clearly established rights under the Fourth Amendment of the U.S. Constitution.

259.     County Attorney Ensey could not have reasonably concluded that the warrant affidavit established probable cause when he reviewed and approved the same for delivery to the Magistrate Judge.

260.     The factual allegations set out in ¶¶ 106-156 herein are specifically re-alleged and re-incorporated herein as supporting the allegation that County Attorney Ensey could not have reasonably concluded that the warrant affidavit established probable cause when he reviewed and approved the same for delivery to the Magistrate Judge.

261.     County Attorney Ensey's own admissions that he questioned whether a crime was committed, that he had expressed reservations to Chief Cody, that the warrants were "bad," and that he thought "oh sh*t" when re-reviewing them after the raids are all evidence that he either (1) knew the warrant affidavit did not establish probable cause but approved it anyway; or (2) fully reviewed the affidavits but failed to even consider whether they established probable cause, instead allowing the "judge to decide" and despite knowing the judge would presume he had approved the warrant materials when reviewing them.

262.     The public nature of the records – defined by statute as subject to the Kansas Open Records Act, the clear lack of any *mens rea* to support any crime and the importance of the journalists' First Amendment rights requiring strict compliance with the Fourth Amendment were

all factors which should have immediately led County Attorney Ensey to determine no crime had been committed, irrespective of the subjective assertions made in the *Applications.*

263.    As illustrated by the Special Prosecutor's Report (Doc. 60-1, pp. 95-96), the conclusion that Ms. Zorn must have falsely identified herself as Ms. Newell was based on a misunderstanding of how the website functioned.

264.    Yet, as the Special Prosecutors concluded, Kansas law did not allow County Attorney Ensey to rely upon a "conclusory assertion or opinion unmoored from specific factual representations...judicial officers cannot provide the independent check contemplated in the Fourth Amendment if they are asked to review conclusions rather than facts."  *See* Doc. 60-1 at p. 96; *see also State v. Althaus,* 49 Kan. App. 2d 210, Syl. ¶ 9 (2013).

265.    Despite this requirement, County Attorney Ensey simply accepted the conclusory opinions in the *Affidavit* as supportive of probable cause.

266.    County Attorney Ensey knew or reasonably should have known that his actions in approving the warrants for delivery to a judge – who would believe he had thoroughly reviewed and approved them before making her own determination – would cause issuance of the illegal warrants and a violation of Ms. Gruver and the other *Record* reporters' constitutional rights under the Fourth Amendment.

267.    County Attorney Ensey, in reviewing the warrant materials, utterly failed to consider – or considered and failed to act upon – the clear requirement of "scrupulous exactitude" in seizing materials which may be protected under the First Amendment.

268.    In reviewing the warrant materials, County Attorney also utterly failed to consider – or considered and failed to act upon – clearly-established law finding that a seizure is to one type of material in one setting may be unreasonable in a different setting or with respect to another kind

of material (e.g., First Amendment protected materials).  *Zurcher, 436 U.S. at 564, citing Roaden v. Kentucky*, 413 U.S. 496, 501 (1973).

269.    Sheriff Soyez is liable in his individual capacity for his conduct violating Ms. Gruver's clearly established rights under the Fourth Amendment of the U.S. Constitution.

270.    The factual allegations set out in ¶¶ 157-196 herein are specifically re-alleged and re-incorporated herein as supporting the allegation that Sheriff Soyez conspired with Chief Cody to deprive Ms. Gruver and the other *Record* journalists of their constitutional rights – rights which extended to the Fourth Amendment as well.

271.    Plaintiff further reasserts and realleges the conspiracy allegations set out in ¶¶ 228-241 as though fully set out under this Count.

272.    Sheriff Soyez's actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, and he may be subjected to punitive damages.

273.    Det. Christner is liable in his individual capacity for his conduct violating Ms. Gruver's clearly established rights under the Fourth Amendment of the U.S. Constitution.

274.    The factual allegations set out in ¶¶ 197-209 herein are specifically re-alleged and re-incorporated herein as supporting the allegation that Det. Christner violated Ms. Gruver's constitutional rights under the Fourth Amendment by procuring an unlawful warrant.

275.    Det. Christner knew or reasonably should have known that probable cause did not exist to support the violation of any crime by Ms. Zorn or anyone else at the *Record*.

276.    Det. Christner knew or reasonably should have known that his misstatements and omissions in the warrant affidavit would lead to the procurement of an unlawful warrant, yet proceeded with drafting the affidavit and sending it to Chief Cody.

277.    Det. Christner's technical expertise was an integral component of the entire mission to take down the *Record,* and Det. Christner's unlawful actions directly caused the issuance of the illegal warrants.

278.    Det. Christner's actions were malicious and recklessly indifferent to plaintiff Gruver's federally protected rights, and he may be subjected to punitive damages.

279.    Ms. Gruver's rights under the Fourth Amendment of the United States Constitution were clearly established at the time of the events at issue.

280.    As a direct and proximate result of defendants Ensey, Soyez & Christner's conduct violating Ms. Gruver's constitutional rights, plaintiff Gruver has sustained damages, including, but not limited to, emotional distress, mental anguish and physical injury.

### <u>THIRD COUNT:</u> *Privacy Protection Act Claim Pursuant to 42 U.S.C. § 2000aa – Defendant Soyez, in his official capacity*

Plaintiff hereby adopts by reference paragraphs one through two hundred and eighty (1-280) inclusive, and, in addition, further states and alleges:

281.    The Privacy Protection Act of 1980 ("PPA") makes it "unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any [work product materials possessed by a person reasonably believed to have a purpose to disseminate] [documentary materials, other than work product materials, possessed by a person in connection with a purpose to disseminate] to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce…" 42 U.S.C. § 2000aa(a) & (b).

282.    The PPA defines "documentary materials" as "materials upon which information is recorded," including "written or printed materials," as well as "other mechanically, magnetically or electronically recorded cards, tapes, or discs." 42 U.S.C. § 2000aa-7(a).

283.    The PPA defines "work product materials" as materials prepared in connection with a purpose of communicating such materials to the public and which include mental impressions, conclusions, opinions, or theories of the author.  42 U.S.C. § 2000aa-7(b).

284.    The warrants for the *Record's* offices and Eric & Joan Meyer's home sought both "documentary" and "work product" materials.

285.    As one example, the search warrant sought "Documents and records pertaining to Kari Newell," which would include the reporters' notes about Ms. Newell, drafts of unpublished articles about Ms. Newell, and other internal communications about Ms. Newell.

286.    The search terms used to conduct the ostensible "preview search" included terms which would include the reporters' notes about the state, city officials, drafts of unpublished articles about the state and city officials, internal communications about the state and city officials, etc. – these search terms included the terms "Kansas," "Brogan Jones," and "Ruth Herbel."

287.    The *Record* is a newspaper "in or affecting interstate commerce" insofar as it regularly mailed its papers to subscribers in states such as Arizona, California, Colorado, Illinois, Iowa, Minnesota, Missouri & Wisconsin.

288.    The *Record*'s website, marionrecord.com, posted newspaper content available outside the State of Kansas as well, and is an "other similar form of public communication" as provided under the PPA.

289.    At the time of the raids, probable cause did not exist to believe that Eric Meyer, Joan Meyer, Phyllis Zorn, Deb Gruver or anyone else at the *Record* had committed any criminal offense, including offenses set out under K.S.A. 21-6107 ("Identity Theft") or K.S.A. 21-5839 ("Unlawful Acts Concerning Computers").

290.    *Record* staff, including Eric Meyer's and Phyllis Zorn's use of the Kansas Driver's License Check tool on the public-facing KDOR website was fully legal in all respects.

291.    The first sentence of K.S.A. 74-2012 ("Division of vehicles, records; disclosure; fees") states "All motor vehicle records shall be subject to the provisions of the open records act, except as otherwise provided under the provisions of this section and by K.S.A. 65-2422d and 74-2022, and amendments thereto."  K.S.A. 74-2012(a)(1).

292.    The exceptions to open records carved out under K.S.A. 74-2012(b) – "All motor vehicle records that relate to the physical or mental condition of any person, have been expunged or are photographs or digital images maintained in connection with the issuance of drivers' licenses" – do not apply here.

293.    The information accessed by Ms. Zorn and the *Record* relating to Ms. Newell's license suspension due to a DUI conviction was fully within the purview of the Kansas Open Records Act.

294.    The PPA also provides that a "government officer or employee may not search for or seize [documentary or work product] materials under the provisions of this paragraph if the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein."  42 U.S.C. § 2000aa(a)-(b).

295.    The PPA provides that such materials, or the information contained in such materials, can only be obtained through a court-ordered subpoena, allowing the party in possession of the materials an opportunity to object.

296.    As described in the warrant applications, the purpose of the search was to seize the "Department of Revenue record" of Ms. Newell, the "letter" to Newell, and the "information" in

the "record" and "letter" – the very materials which require a court-ordered subpoena under the PPA.

297.    Instead of pursuing a subpoena, Chief Cody and the other involved officers illegally seized the materials, in violation of the PPA.

298.    No other exceptions to application of the PPA apply to the raids, as the immediate seizure was not necessary to prevent death or serious bodily injury, no subpoena *duces tecum* had been issued for any of the sought materials, and there was no cause to believe that providing notice to the *Record* of the sought materials through a subpoena *duces tecum* would lead to the destruction, alteration, or concealment of such materials.

299.    Eric Meyer's original e-mail of August 4, 2023, in which he notified law enforcement of the circumstances leading to acquisition of Ms. Newell's records, reflected that the contrary was true – the *Record* had no plans to destroy, alter or conceal the records.

300.    Any person "aggrieved by a search for or seizure of materials in violation" of the PPA may pursue a cause of action pursuant to 42 U.S.C. § 2000aa-6(a), even if the aggrieved party did not hold a possessory interest in the searched or seized items, so long as (1) some person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast or other similar form of public communication possessed such materials (in the case of work product materials) (42 U.S.C. § 2000aa(a)); and/or (2) the materials were possessed by a person in connection with a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication (in the case of documentary materials) (42 U.S.C. § 2000aa(b)).

301.    Ms. Gruver is a "person[s]" aggrieved by a search for or seizure of materials in violation of" the PPA.

302.    Marion County and the Marion County Sheriff are "other governmental unit[s]" as defined under the PPA, § 2000aa-7(c).

303.    Sheriff Soyez was "acting within the scope or under color of [his] office or employment" when he directed the raids on the *Record's* newsroom.

304.    Both the *Record* and Ms. Gruver – in addition to other employees of the newspaper – have been damaged by Sheriff Soyez's wrongful actions in violating the PPA.

305.    Sheriff Soyez acted maliciously and wantonly in violating Ms. Gruver's rights.

306.    Ms. Gruver maintained a privacy interest in the work product and documentary materials contained on her *Record* computer.

307.    In addition to actual damages, Ms. Gruver is entitled to recover her attorney's fees for prosecuting a violation of the PPA pursuant to 42 U.S.C. § 2000aa-6(f).

### FOURTH COUNT: *Municipal Liability – Acts as a Final Policymaker –*
### *Defendant Soyez, in his official capacity*

Plaintiff hereby adopts by reference paragraphs one through three hundred and seven (1-307) inclusive, and, in addition, further states and alleges:

308.    Kansas law provides that the Sheriff is a separately elected official with terms, duties, training and authorities set out under K.S.A. 19-801a.

309.    The Sheriff is charged by statute with "keep[ing] and preserv[ing] the peace in their respective counties" pursuant to K.S.A. 19-813.

310.    Based upon these legal duties, Sheriff Soyez is empowered to set official municipal policy for the Marion County Sheriff's Office.

311.    Sheriff Soyez's actions and the actions of his deputies, including Det. Christner, were undertaken pursuant to official municipal policy.

312.   To avoid duplicative claims, plaintiff asserts these municipal liability claims against Sheriff Soyez in his official capacity, and not against the Board of County Commissioners for Marion County, Kansas.

313.   Sheriff Soyez's wrongful acts in setting municipal policy led to the illegal and improper actions set out by Sheriff Soyez and Det. Christner herein, including the violation of Ms. Gruver's rights under the First and Fourth Amendments to the United States Constitution, the seizure of her cellular phone and *Record* computer and all damages resulting therefrom.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DEBBIE K. "DEB" GRUVER prays for damages against the defendants, individually and jointly, as follows: (1) compensatory damages in excess of $75,000.00, exclusive of interest and costs; and (2) costs, expenses and reasonable attorney's fees pursuant to K.S.A. 42 U.S.C. § 1988 & 42 U.S.C. § 2000aa-6(f).  Plaintiff also claims punitive damages against defendants Soyez and Christner.  Plaintiff further requests any other relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff DEBBIE K. "DEB" GRUVER hereby demands a trial by jury.  Plaintiff filed a Designation of Place of Trial contemporaneous to the filing of her original Complaint, designating Wichita, Kansas as the Place of Trial.

Respectfully submitted,

HUTTON & HUTTON

*/s/ Blake A. Shuart, #24463*
Blake A. Shuart, #24463
Andrew W. Hutton, #10264
J. Darin Hayes, #16755
Matthew M. Dwyer, #22492
Kaylea Knappenberger McGrath, #28902
8100 E. 22nd St. N., Bldg. 1200
Wichita, KS  67226
Phone: (316) 688-1166
Fax: (316) 686-1077
E-Mail: Blake.Shuart@huttonlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 5th day of May 2025, the above and foregoing *Third Amended Complaint* was electronically filed via the Court's CM/ECF system, which will send electronic notice of filing to all counsel of record.

*/s/ Blake A. Shuart*
Blake A. Shuart, #24463